**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE:** | : | |
| | : | |
| **THOMAS DARE ARBOGAST,** | : | **Bankruptcy No. 10-20237-TPA** |
| | : | |
| Debtor. | : | **Chapter 7** |

...............................................................:...............................................................

| | | |
|---|---|---|
| **Natalie Lutz Cardiello, Trustee,** | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Adversary No. 10-2092-BM** |
| | : | |
| **Thomas D. Arbogast &** | : | |
| **Mary Claire Arbogast,** | : | |
| Defendants. | : | |

...............................................................:...............................................................

| | | |
|---|---|---|
| **Trizechahn Gateway, LLC &** | : | |
| **Natalie Lutz Cardiello, Trustee,** | : | |
| Movants, | : | |
| | : | |
| v. | : | **Related to Doc. No. 20** |
| | : | |
| **Thomas Dare Arbogast,** | : | |
| Respondent. | : | |

Appearances:    John P. Vetica, Jr., for Natalie Lutz Cardiello, Trustee.
                Neal H. Levin, for Trizechahn Gateway, LLC.
                Nicholas D. Krawec, for Thomas Dare Arbogast.
                Joseph F. McDonough, for Mary Claire Arbogast.

<u>**MEMORANDUM OPINION**</u>

This adversary proceeding and related matters in several other bankruptcy

cases have been brought against some of the most talented attorneys practicing

within the Commonwealth of Pennsylvania.  The genesis for such actions is the

breach of a lease agreement by such attorneys prior to the dissolution of their

law firm (Titus & McConomy).  Such actions are brought pursuant to the

"fraudulent transfer statutes" that have been promulgated in Pennsylvania.

Although the term "fraud" has been utilized throughout the litigation involving each of the attorneys, this Court concludes, without equivocation, that no basis exists to make any finding against any of them regarding actual fraud. To the contrary, the Court found there to be no question of credibility on their part in any of the adversary proceedings. Therefore, the decision that follows, as well as those that will follow, is directed primarily to the issue of constructive fraud without any implication of moral turpitude on the part of the attorneys.

## INTRODUCTION

Natalie Lutz Cardiello, the Chapter 7 Trustee (hereafter "the Trustee") for Thomas Dare Arbogast, the instant debtor (hereafter "the Debtor"), prosecutes the instant adversary proceeding (Adversary No. 10-2092-BM) so as to pursue a fraudulent transfer action against the Debtor and Mary Claire Arbogast, his non-debtor spouse (hereafter "Mrs. Arbogast"). The fraudulent transfer action includes three counts and is pursued pursuant to Pennsylvania state fraudulent transfer law via 11 U.S.C. § 544(b)(1).

The Trustee and Trizechahn Gateway, LLC (hereafter "Trizec"), who is a pre-petition creditor of the Debtor, also object to many of the bankruptcy exemptions that the Debtor has taken. Such objection to exemptions is filed at Document No. 20 in the main case docket (i.e., Bankruptcy No. 10-20237-BM).

Both of the instant matters were actually tried twice. The first trial was conducted on October 14 and 15, 2010, by the Honorable M. Bruce McCullough, to whom these matters were originally assigned. Before Judge McCullough could enter a final opinion and order disposing of the matters, he died.

2

Subsequent to his death, the matters were reassigned to this Court.  This Court

concluded that, in order to satisfy the requirements of Fed.R.Civ.P. 63, which is

made applicable to the instant matters by way of Fed.R.Bankr.P. 9028, it needed

to retry the instant matters.  Such retrial has since been held.

The instant opinion and accompanying order also dispose of a motion for

sanctions that the Debtor and Mrs. Arbogast brought prior to the first trial for the

apparent failure by the Trustee and Trizec to comply with a consent case

management Order of Court that was entered on April 21, 2010.

For the reasons set forth below, the Court will grant judgment in favor of

the Trustee, and against the Debtor and Mrs. Arbogast jointly and severally, on

the Trustee's fraudulent transfer action in the amount of $143,389.10.  The Court

will also overrule that exemption objection of the Trustee and Trizec that it

adjudicates herein.  Finally, the Court will deny the sanctions motion that has

been brought by the Debtor and Mrs. Arbogast.

## STATEMENT OF FACTS

The Debtor is an attorney who at one time was a partner at Titus and

McConomy (hereafter "T & M"), a now-disbanded law partnership.  In July 2000

Trizec, who was the owner of the building in which T & M had rented space, filed

a lawsuit against T & M in the Pennsylvania Court of Common Pleas for

Allegheny County (hereafter "the Common Pleas Court").  Trizec filed such

lawsuit on the basis that T & M had breached its lease agreement with Trizec

(hereafter "the Lease Litigation").  Trizec named as defendants in the Lease

Litigation approximately 20 individual partners of T & M including the Debtor.

3

On June 7, 2006, the Common Pleas Court entered judgment in the Lease Litigation in favor of Trizec, which judgment was jointly and severally entered against, *inter alia*, the Debtor. The amount of such judgment was for roughly $2.7 million, which amount is alleged to have subsequently grown to more than $3 million by virtue of interest and legal fees. In an attempt to collect on such judgment from the Debtor, Trizec commenced a fraudulent transfer action on April 23, 2007, against the Debtor and Mrs. Arbogast in the Common Pleas Court (hereafter "the Arbogast Fraudulent Transfer Action").

The Lease Litigation judgment was subsequently appealed to the Pennsylvania Superior Court, which affirmed the Common Pleas Court's decision on July 3, 2007, as to most of the named defendants. However, the Pennsylvania Superior Court reversed the Common Pleas Court's decision as to the Debtor in particular. As a result of such decision, Trizec discontinued the Arbogast Fraudulent Transfer Action without prejudice on July 27, 2007.

Trizec then appealed the aforesaid Pennsylvania Superior Court decision as it impacted the Debtor's personal liability only to the Pennsylvania Supreme Court. The Pennsylvania Supreme Court ultimately reversed the Pennsylvania Superior Court's decision vis-a-vis the Debtor on July 23, 2009, thereby reimposing personal liability against the Debtor on the Lease Litigation judgment.

On February 3, 2010, Trizec obtained an order from the Common Pleas Court granting Trizec's motion to strike the aforesaid discontinuance of the Arbogast Fraudulent Transfer Action (hereafter "the February 3, 2010 State Court Order"). Before obtaining such court order, Trizec, on January 20, 2010, sent a

4

letter to the Common Pleas Court requesting that the aforesaid motion to strike

discontinuance be granted (hereafter "the January 20, 2010 Letter").

On January 15, 2010, or just several days before Trizec sent the January

20, 2010 Letter (and just weeks before Trizec obtained the February 3, 2010

State Court Order), the Debtor filed a voluntary Chapter 7 bankruptcy petition.

Trizec neither moved for, nor thus obtained an order from a bankruptcy court that

granted, relief from the automatic stay before it either sent the January 20, 2010

Letter or obtained the February 3, 2010 State Court Order.

On February 23, 2010, the Debtor removed the Arbogast Fraudulent

Transfer Action to this Court.  Such removal served to initiate the instant

adversary proceeding.  On June 10, 2010, this Court entered an order that

substituted the Trustee for Trizec as the plaintiff in the instant adversary

proceeding, thereby placing such action in its present context.

## STATEMENT OF THE CASE

The complaint that sets forth the Arbogast Fraudulent Transfer Action

contains three counts.  The first count pleads an actual fraudulent transfer action

under Pennsylvania's version of the Uniform Fraudulent Transfer Act (i.e., 12

Pa.C.S.A. § 5104(a)(1)), and the latter two counts plead constructive fraudulent

transfer actions under such statute (i.e., 12 Pa.C.S.A. §§ 5104(a)(2)(ii) and

5105).

12 Pa.C.S.A. § 5104(a)(1) & (2)(ii) provides, in pertinent part, that:

A transfer made or obligation incurred by a debtor is

fraudulent as to a creditor, whether the creditor's claim arose before

5

or after the transfer was made or the obligation was incurred, if the

debtor made the transfer or incurred the obligation:

> (1)  with actual intent to hinder, delay or defraud any creditor
>
> of the debtor; or
>
> (2)  without receiving a reasonably equivalent value in
>
> exchange for the transfer or obligation, and the debtor:
>
> > ...
> >
> > (ii) intended to incur, or believed or reasonably should
> >
> > have believed that the debtor would incur, debts
> >
> > beyond the debtor's ability to pay as they became
> >
> > due.

12 Pa.C.S.A. § 5104(a)(1) & (2)(ii) (Purdon's 2011).  12 Pa.C.S.A. § 5105

provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as
>
> to a creditor whose claim arose before the transfer was made or the
>
> obligation was incurred if the debtor made the transfer or incurred
>
> the obligation without receiving a reasonably equivalent value in
>
> exchange for the transfer or obligation and the debtor was insolvent
>
> at that time or the debtor became insolvent as a result of the
>
> transfer or obligation.

12 Pa.C.S.A. § 5105 (Purdon's 2011).

The Trustee pursues the Arbogast Fraudulent Transfer Action pursuant to

11 U.S.C. § 544(b)(1).  11 U.S.C. § 544(b)(1) allows a bankruptcy trustee to

6

"avoid any transfer of an interest of the debtor in property ... that is voidable

under applicable [nonbankruptcy] law by a creditor holding an unsecured claim

[against said debtor's bankruptcy estate]."  11 U.S.C.A. § 544(b)(1) (West 2011).

The gravamen of the Arbogast Fraudulent Transfer Action is that the

Debtor engaged in fraudulent transfers when, subsequent to July 2000, he

directed Schnader Harrison Segal & Lewis, LLP (hereafter "the Schnader Law

Firm"), the law firm that the Debtor worked for subsequent to the dissolution of T

& M, to directly deposit his individual compensation that he solely earned

therefrom into a checking account that he jointly owned with Mrs. Arbogast as

tenants by the entirety (hereafter "the Entireties Checking Account").  The basis

for such charge is (a) that, by virtue of the aforesaid direction regarding such

deposits, the Debtor thereby transferred such compensation, and (b) that such

transfers by the Debtor were fraudulent, either actually or constructively so,

because they had the effect of shielding the Debtor's individual compensation

from the reach of his creditors such as Trizec.

The Trustee pursues such alleged fraudulent transfers under 12 Pa.C.S.A.

§ 5104(a)(1) on the ground that the Debtor engaged in such transfers with actual

intent to hinder, delay, or defraud his creditors, including Trizec.  The Trustee

pursues such alleged fraudulent transfers under 12 Pa.C.S.A. § 5104(a)(2)(ii)

and 12 Pa.C.S.A. § 5105 on the ground that (a) the Debtor made such transfers

without receiving reasonably equivalent value in return, and (b) he was either

insolvent at the time of, or was rendered insolvent by, such transfers.[1]

As relief via the Arbogast Fraudulent Transfer Action, the Trustee seeks, pursuant to 11 U.S.C. § 550(a)(1), a judgment against both the Debtor and Mrs. Arbogast for the amount of the transfers to be avoided as fraudulent. 11 U.S.C. § 550(a)(1) provides, in pertinent part, that "to the extent that a transfer is avoided under section 544, ... the trustee may recover, for the benefit of the estate, the property transferred, or ... the value of such property, from ... the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C.A. § 550(a)(1) (West 2011). The theory for such requested relief is that, because the Debtor transferred his individual compensation into the Entireties Checking Account, and since both the Debtor and Mrs. Arbogast jointly owned such account, the Debtor and Mrs. Arbogast both constitute initial transferees of such transfers (and thus the entities for whose benefit such transfers were made as well).

The Trustee relies on the decision in In re Meinen, 232 B.R. 827, 840-43 (Bankr.W.D.Pa. 1999), and the cases cited therein for her position that the Debtor's periodic transfers of his solely-earned individual compensation into the Entireties Checking Account constitute constructive fraudulent transfers. The Meinen decision and the cases cited therein do indeed support the Trustee's

---

[1]With respect to the "insolvency" component of the Trustee's constructive fraudulent transfer actions, she must prove under § 5105 that the Debtor was either insolvent at the time of, or was rendered insolvent by, the transfers in question. For her action under § 5104(a)(2)(ii), the Trustee must prove that the Debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

position, provided that such deposited compensation, after its deposit into the
Entireties Checking Account, was not utilized to satisfy reasonable and
necessary household expenses for the maintenance of the Debtor's family.  *See*
Id.  To the extent that such deposits were used to satisfy reasonable and
necessary expenses for the maintenance of the Debtor's family, Meinen, with but
one exception, would dictate a holding that such deposits do not constitute
constructive fraudulent transfers.  *See* Id. at 842-43.  The exception just referred
to is "those deposits in question which were then used by ... [the Debtor and Mrs.
Arbogast] to purchase other assets which are presently held as entireties
property by" them, Id. at 843; these latter deposits, under Meinen, would
constitute constructive fraudulent transfers regardless of their necessity to the
Debtor and Mrs. Arbogast, *see* Id.

Both before and at trial, by way of what was labelled at trial as
Defendants' Exhibit O, the Trustee and Trizec have identified what they contend
are four, or perhaps five, groups of disbursements that were made from the
Entireties Checking Account.  The Trustee and Trizec contend that (a) the direct
deposits of the Debtor's individual compensation into the Entireties Checking
Account were utilized to fund, *inter alia*, the foregoing four or five groups of
disbursements, and (b) such direct deposits, to the extent that they were utilized
to make such disbursements, constitute not only fraudulent transfers but also the
universe of the fraudulent transfers that are sought to be avoided by way of the
Arbogast Fraudulent Transfer Action.

The aforesaid five groups of alleged disbursements are:

9

(a)    $338,375.31 of disbursements that were allegedly made to a checking account that was owned solely by Mrs. Arbogast (hereafter "Mrs. Arbogast's Sole Account"), from which she then drew checks in an equal sum – the position of the Trustee and Trizec is that $338,375.31 worth of the direct deposits that the Schnader Law Firm made into the Entireties Checking Account were then transferred out into Mrs. Arbogast's Sole Account, from which such funds were then utilized by her to make purchases of things other than necessities;

(b)    a collection of alleged disbursements made with respect to a residence in Florida that the Debtor and Mrs. Arbogast purchased in June 2004, which residence was, and is, not their primary residence (hereafter "the Florida Residence") – the amounts in question are (i) $70,000 for a down payment on the Florida Residence, (ii) mortgage payments (both principal and interest) on the loan obtained to purchase the Florida Residence, coupled with interest on the loan allegedly obtained to make the aforesaid down payment, all equalling $103,806.60, and (iii) $96,605.30 worth of expenditures that were made for upkeep on the Florida Residence;

(c)    alleged disbursements that were made to maintain memberships in three different country clubs, namely (i) $26,132.51 for membership in the Duquesne Club, (ii) 60,647.28 for membership in the Long Vue Club, and (iii) $42,444.46 for membership in the Marsh Landing Country Club;

(d)    $86,000 worth of contributions that were made into several of the Debtor's retirement accounts in 2003 and 2004 (hereafter "the Retirement Account

10

Contributions"), some of which contributions were made by the Debtor into his 401(k) account and some of which were made by the Schnader Law Firm on behalf of the Debtor into another retirement account; and

(e)    $75,842.42 worth of alleged disbursements made to fund premium payments made by the Debtor for various life insurance policies that primarily benefitted Mrs. Arbogast.

The five groups of alleged disbursements were made at various times throughout a period that began on April 23, 2003, and ended on January 15, 2010, which is when the Debtor filed for bankruptcy.

In response to the Arbogast Fraudulent Transfer Action, the Court understands the Debtor and Mrs. Arbogast to essentially contend that none of the direct deposits by the Schnader Law Firm into the Entireties Checking Account constitute fraudulent transfers pursuant to either § 5104(a)(1), § 5104(a)(2)(ii), or § 5105, and that even if they do, they are not recoverable from Mrs. Arbogast pursuant to § 550(a)(1).  The Debtor and Mrs. Arbogast so contend because they argue (a) that, as a matter of law, what may be recovered from Mrs. Arbogast via § 550(a)(1) are such direct deposits which she utilized for luxury items above basic living expenses that directly benefitted her, and (b) that Mrs. Arbogast did not utilize any of such direct deposits to purchase luxury items above basic living expenses that directly benefitted her.

The genesis for such defense by the Debtor and Mrs. Arbogast is language contained in an April 2, 2009 Memorandum and Order of Court that was entered by the Common Pleas Court in a separate fraudulent transfer action

11

between Trizec, on the one hand, and Paul and Bonnie Titus, another of the

former T & M partners and his spouse, on the other hand (hereafter "the Titus

Action").  In the Titus Action at that time Trizec sought the avoidance of alleged

fraudulent transfers by Paul Titus that are identical in nature to those sought to

be avoided in the Arbogast Fraudulent Transfer Action.  The Common Pleas

Court, in such April 2, 2009 Memorandum and Order of Court, held that Trizec

may recover from Bonnie Titus "only money defendant-wife [(i.e., Bonnie Titus)]

used from the jointly held account into which the employer deposited defendant-

husband's [(i.e., Paul Titus')] wages for luxury items above basic living expenses

which directly benefitted her."  It is this holding upon which the Debtor and Mrs.

Arbogast rely for their defense in the instant matter.

The Common Pleas Court decision of April 2, 2009, in the Titus Action

was preceded by another related decision by such court in the same action on

May 29, 2008 (hereafter collectively "the Titus Decisions").  This Court

understands the Common Pleas Court in the Titus Decisions to have held that (a)

the direct deposits of Paul Titus' individual compensation into the Tituses'

entireties checking account only constitute fraudulent transfers to the extent that

they were spent on luxuries, and (b) even to the extent that such deposits were

spent on luxuries, thereby making them fraudulent transfers, they can only be

recovered from Bonnie Titus if (i) she is the one who actually spent such

deposits, and (ii) the luxury purchases actually benefitted her.  By virtue of the

latter of the two preceding holdings, the Common Pleas Court necessarily held

that Bonnie Titus could not have been a transferee of deposits that constituted

fraudulent transfers unless (a) she is the one who actually spent such deposits, and (b) the luxuries purchased with such deposits actually benefitted her.

In addition to the Arbogast Fraudulent Transfer Action, the Trustee and Trizec both object to certain of the bankruptcy exemptions that the Debtor has taken.  The parties entered into a stipulation dated October 15, 2010, that resolves most of such exemption objections.  The gist of such resolution is that, with two exceptions, such exemption objections will continue to be pursued but only to the extent that the assets sought to be exempted by the Debtor were purchased with funds that this Court determines, by resolution of the Arbogast Fraudulent Transfer Action, were fraudulently transferred by the Debtor.  The effect of such stipulation, disregarding the two aforesaid exceptions, is that (a) the amount to be recovered via such exemption objections will equal that amount that is to be recovered via the Arbogast Fraudulent Transfer Action, and (b) such exemption objections thus effectively need not be considered further.

The two exceptions are exemption objections regarding certain retirement assets that are solely owned by the Debtor.  The parties have agreed that an exemption objection regarding one particular retirement asset of the Debtor is withdrawn except to the extent that it is preserved in a state court action that is pending against the Schnader Law Firm.  Because such exemption objection is withdrawn but then preserved to be effectively dealt with in another court, such exemption objection will not be dealt with any further by this Court.

The parties have also agreed that the Trustee and Trizec will continue to pursue at this time an exemption objection with respect to the Retirement

13

Account Contributions that, as set forth above, are perhaps also sought to be
recovered as fraudulent transfers via the Arbogast Fraudulent Transfer Action
(i.e., the $86,000 worth of contributions that were made into several of the
Debtor's retirement accounts in 2003 and 2004).  The one caveat to the
exemption objection regarding the Retirement Account Contributions is that the
Trustee and Trizec thereby object to more than just the $86,000 worth of
contributions that were made into several of the Debtor's retirement accounts in
2003 and 2004.  In particular, because the Debtor admitted at trial that
contributions were made into such retirement accounts from 2005 through 2010
as well, the Trustee and Trizec contend that they may also object to the Debtor's
exemption of such additional contributions notwithstanding that they failed to
apprise the Debtor of their intention to so object prior to trial.

## DISCUSSION

As an initial matter, the Court immediately holds that the Trustee – to the
extent that she seeks to do so – cannot successfully pursue the Retirement
Account Contributions, be they for just 2003 and 2004 or for 2005 through 2010
as well, as fraudulent transfers via the Arbogast Fraudulent Transfer Action.  The
Court so holds because (a) the Trustee pursues as fraudulent transfers via the
Arbogast Fraudulent Transfer Action only deposits that the Schnader Law Firm
made of the Debtor's compensation directly into the Entireties Checking Account,
and (b) the Court finds that none of the Retirement Account Contributions were
made into the Entireties Checking Account before they passed into retirement
accounts of the Debtor.  The Court finds as it does because it also finds that all of

14

the Retirement Account Contributions were made directly by the Schnader Law Firm into retirement accounts of the Debtor (some such deposits at the Debtor's insistence and others supposedly not pursuant to his direction).

Such holding by the Court, however, does not mean that the Trustee and Trizec cannot pursue recovery of the Retirement Account Contributions via their objection to the Debtor's exemption of the Retirement Account Contributions.  As set forth below, the Trustee and Trizec base such exemption objection, in part, upon their position that the Retirement Account Contributions constitute fraudulent transfers, even if such transfers did not pass through the Entireties Checking Account.  Therefore, that the Retirement Account Contributions did not pass through the Entireties Checking Account, and thus cannot be pursued via the Arbogast Fraudulent Transfer Action, does not serve to negate the exemption objection that has been lodged against them.

**I.      The Arbogast Fraudulent Transfer Action.**

Numerous legal issues abound with respect to the Arbogast Fraudulent Transfer Action, including (a) whether the Trustee can pursue such action via § 544(b)(1), (b) the appropriate "lookback period" for such action, (c) what law should (or must) be applied to determine whether, and to what extent, the direct deposits of the Debtor's individual compensation into the Entireties Checking Account constitute fraudulent transfers, (d) whether the direct deposits of the Debtor's individual compensation into the Entireties Checking Account constitute transfers by the Debtor in the first instance, (e) whether Mrs. Arbogast constitutes an initial transferee of those deposits that are determined to constitute fraudulent

15

transfers even if she did not spend such deposits and/or the deposits were not spent so as to benefit her, and (f) whether the Debtor was insolvent at the time of, or was rendered insolvent by, such direct deposits.

**A.      The lookback period for the Arbogast Fraudulent Transfer Action and whether the Trustee can pursue such action.**

Fraudulent transfer actions under Pennsylvania's version of the Uniform Fraudulent Transfer Act generally have a four-year statute of limitations as measured from the date that a transfer sought to be avoided was made.  *See* 12 Pa.C.S.A. § 5109 (Purdon's 2011).  Because Trizec commenced the Arbogast Fraudulent Transfer Action on April 23, 2007, Trizec appropriately thereby sought to avoid as being fraudulent those transfers that were made by the Debtor between April 23, 2003, and April 23, 2007.

Provided that Trizec held an unsecured claim against the Debtor on January 15, 2010 (i.e., the date when the Debtor filed for bankruptcy), the Trustee may, pursuant to § 544(b)(1), pursue any fraudulent transfer action that Trizec could have pursued on that date, such as – one would think – the Arbogast Fraudulent Transfer Action inclusive of such action's 4-year lookback period between April 23, 2003, and April 23, 2007.  *See* In re Andersen, 166 B.R. 516, 523 (Bankr.D.Conn. 1994) ("if a creditor has a cause of action which is not time barred, the trustee's derivative action under § 544(b) is likewise not time barred"); In re Hill, 332 B.R. 835, 839 n.3 (Bankr.M.D.Fla. 2005) (same); In re Moore, 608 F.3d 253, 260-61 (5th Cir. 2010) (same).  Trizec indisputably held an outstanding unsecured claim against the Debtor on January 15, 2010, namely

16

the joint and several judgment that emanates from the Lease Litigation which
now approximates $3 million.  Therefore, without more, the Court is compelled to
hold that the Trustee may properly pursue the Arbogast Fraudulent Transfer
Action inclusive of such action's 4-year lookback period between April 23, 2003,
and April 23, 2007.

The Debtor and Mrs. Arbogast disagree that the Trustee may pursue a
fraudulent transfer action against them that includes a 4-year lookback period
from April 23, 2003, until April 23, 2007.  Although they concede that the Trustee
may bring a fraudulent transfer action against them, they argue that the
applicable lookback period should be for the four-year period that ends on
January 15, 2010.  The basis for such dispute by the Debtor and Mrs. Arbogast
rests upon their position that, as of January 15, 2010, Trizec did not have the
right to pursue the Arbogast Fraudulent Transfer Action inclusive of such action's
4-year lookback period between April 23, 2003, and April 23, 2007.  The Debtor
and Mrs. Arbogast take such position (a) because, as of January 15, 2010, the
Arbogast Fraudulent Transfer Action had been discontinued in the Common
Pleas Court, and (b) because such action could not be pursued further until such
court struck such discontinuance, thereby reinstating such action.

The Court rejects the foregoing position of the Debtor and Mrs. Arbogast
for several reasons.  First, even though, as of January 15, 2010, the Common
Pleas Court had not yet reinstated the Arbogast Fraudulent Transfer Action by
striking the aforesaid discontinuance, that does not mean that Trizec, as of such
date, did not have the right to seek such reinstatement of, and then the right to

17

pursue, such action.  Trizec, in fact, had such rights as of January 15, 2010,

which means that the Trustee is free to take advantage of the same rights

pursuant to § 544(b)(1).  Second, that the Trustee could take advantage of the

foregoing rights of Trizec by virtue of § 544(b)(1) is not changed by the fact that

Trizec, without relief from, and thus in clear violation of, the automatic stay,

sought the post-petition entry of the February 3, 2010 State Court Order by the

Common Pleas Court, by which order such court granted Trizec's motion to strike

the aforesaid discontinuance.  The Court so holds because (a) a creditor, as of

the commencement of a Chapter 7 bankruptcy case, is dispossessed of standing

to further pursue a fraudulent conveyance avoidance action, *see* Sears

Petroleum & Transport Corp., 417 F.Supp.2d 212, 221-22 (D.Mass. 2006); In re

Forbes, 372 B.R. 321, 336 (B.A.P. 6th Cir. 2007); In re Tessmer, 329 B.R. 776,

779 (Bankr.M.D.Ga. 2005), (b) Trizec consequently lacked standing on February

3, 2010, to obtain any order from any court that pertained to the Arbogast

Fraudulent Transfer Action, and (c) it will not attribute to the Trustee, who is the

party who had standing to pursue such action post-bankruptcy petition, any

potentially sanctionable conduct of Trizec, who lacked such standing.

The Court also rejects the foregoing position of the Debtor and Mrs.

Arbogast notwithstanding that the February 3, 2010 State Court Order was

entered subsequent to January 15, 2010, that is in violation of the automatic stay

that arose on such date when the instant bankruptcy case was commenced.[2]

---

[2]Trizec contends that (a) the Common Pleas Court's entry of the February
3, 2010 State Court Order was only a ministerial act, and (b) the entry of such

18

The Debtor and Mrs. Arbogast correctly contend that, because such order was entered in violation of the automatic stay, such order, pursuant to automatic stay principles, would generally be void.  *See* In re Askew, 312 B.R. 274, 281 (Bankr.D.N.J. 2004) (citing In re Siciliano, 13 F.3d 748, 750 (3rd Cir. 1994)). They also correctly contend that, if such order is void, then (a) the Arbogast Fraudulent Transfer Action has not yet actually been reinstated by the Common Pleas Court, and (b) such action cannot presently be pursued by the Trustee prior to such reinstatement.  However, as also set forth above, the Trustee has the right to seek such reinstatement of such action.  Furthermore, it makes little, indeed no, sense to now force the Trustee to seek an order from the Common Pleas Court reinstating the Arbogast Fraudulent Transfer Action after such an order was already entered by such court on February 3, 2010, albeit apparently unknowingly entered by such court in violation of the automatic stay.  Therefore, may this Court, under such circumstances, presently validate the February 3, 2010 State Court Order, thereby allowing the Trustee to pursue the Arbogast Fraudulent Transfer Action free from any obstacles that arise from the foregoing automatic stay violations?  The Court concludes that it may do so.  *See* Askew, 312 B.R. at 281-82 (citing Siciliano, 13 F.3d at 751, to the effect that "§ 362(d) of the Code affords courts an opportunity to cure [or validate] acts that are otherwise void under the automatic stay" in the interests of "equity and judicial

---

order by such court consequently did not violate the automatic stay in the instant bankruptcy case.  The Court, for the reasons that are set forth in the post-trial brief of the Debtor and Mrs. Arbogast (filed on December 20, 2010, at Doc. No. 71), summarily rejects such position by Trizec.

economy"); <u>Maertin v. Armstrong World Industries, Inc.</u>, 241 F.Supp.2d 434, 449

(D.N.J. 2002) (same, citing <u>Siciliano</u>).

The Court also rejects the foregoing position of the Debtor and Mrs.

Arbogast because, as set forth below, when the Court analyzes the Arbogast

Fraudulent Transfer Action utilizing both of the lookback periods that are

advanced by the parties (i.e., from April 23, 2003, until April 23, 2007, as

advanced by the Trustee, or January 15, 2006, until January 15, 2010, as

advanced by the Debtor and Mrs. Arbogast), the Court concludes that the

Trustee is entitled to recover less utilizing the 4/23/03 – 4/23/07 lookback period

that is advanced by her.  Put differently, the Court concludes that the Debtor and

Mrs. Arbogast do better with respect to the Arbogast Fraudulent Transfer Action

if the Court, rather than utilizing the 1/15/06 – 1/15/10 lookback period that is

advanced by them, utilizes the lookback period that is sought by the Trustee.

Because of the foregoing point, the Court views the lookback period issue herein

as being largely academic in nature, that is not particularly relevant from a

practical standpoint.  Therefore, the Court sees no point in dwelling further on the

issue.

In summary, the Trustee is authorized, pursuant to § 544(b)(1), to pursue

the Arbogast Fraudulent Transfer Action inclusive of such action's 4-year

lookback period between April 23, 2003, and April 23, 2007.

As an aside, because Trizec, as set forth above, lacked standing after

January 15, 2010, to take any action that could have negatively affected the

Debtor and Mrs. Arbogast relative to the Arbogast Fraudulent Transfer Action,

they could not conceivably have been harmed by Trizec's automatic stay

violation in the form of the action that Trizec took post-petition to obtain the

Common Pleas Court's entry of the February 3, 2010 State Court Order.  That

being the case, and because the Court does not find that Trizec took the action in

question in knowing violation of the automatic stay, the Court will not impose any

sanctions upon Trizec for such automatic stay violation.

### B. What case authority should be used to resolve the instant matter:  the Titus Decisions, the *Meinen* case, or something else?

### (i) The propriety of the Titus Decisions.

As set forth above, the Debtor and Mrs. Arbogast maintain that the Titus

Decisions should control the resolution of the Arbogast Fraudulent Transfer

Action.  They contend that applying such decisions to the instant matter compels

the result that (a) the direct deposits of the Debtor's individual compensation into

the Entireties Checking Account will only constitute fraudulent transfers to the

extent that they were spent on luxuries, and (b) even to the extent that such

deposits were spent on luxuries, Mrs. Arbogast cannot be deemed to have been

a transferee of such deposits from whom a recovery can be had unless (i) she is

the one who actually spent such deposits, and (ii) the luxury purchases actually

benefitted her.  This Court agrees that, if the Titus Decisions control the

resolution of the Arbogast Fraudulent Transfer Action, then the foregoing result

advanced by the Debtor and Mrs. Arbogast is correct.

However, this Court respectfully disagrees with many of the basic rulings

21

in the Titus Decisions.  For instance, this Court does not agree, within the context

of the instant matter, that the direct deposits of the Debtor's individual

compensation into the Entireties Checking Account will only constitute fraudulent

transfers to the extent that they were spent on luxuries.  The Court concludes

instead that such direct deposits may constitute fraudulent transfers, at least

constructive fraudulent transfers, unless they were spent on necessities; that is,

provided that such deposits were not spent on necessities, they may constitute

constructive fraudulent transfers even if they were also not spent on luxuries.

        The preceding holding by this Court is consistent with that of the court in

Meinen, *see* Meinen, 232 B.R. at 842-43, which latter ruling the Court finds to be

far more persuasive than the corresponding holding in the Titus Decisions.  The

Meinen holding is more persuasive to this Court than are the Titus Decisions

because the Meinen court relied exclusively on longstanding case authorities

construing Pennsylvania law, *see* Id., whereas the Titus Decisions are not based

on any case authority.  The Court also so holds because it is simply not true, as

the Common Pleas Court appeared to assume, that, if something is not a luxury,

then it must be a necessity.  Indeed, many items can fall in between the two

categories.  *See* In re Alexo, 436 B.R. 44, 49 (Bankr.N.D.Ohio 2010) (holding,

within the context of 11 U.S.C. § 523(a)(2)(C), wherein a similar issue also

arises, that "[a] medium between the two parameters [of necessities and luxuries]

exists, where a transaction is neither fish nor fowl"); In re Blackburn, 68 B.R. 870,

874 (Bankr.N.D.Ind. 1987) ("Certain goods may not qualify as necessities and

[they] still [will] not be luxuries"); In re Shaw, 294 B.R. 652, 655 (Bankr.W.D.Pa.

2003) (same, quoting Blackburn and citing In re Stewart, 91 B.R. 489, 497

(Bankr.S.D.Iowa 1988)).  The only category that is relevant for fraudulent transfer

purposes, consistent with Pennsylvania law, is that of necessities.  *See* Meinen,

232 B.R. at 842-43.  Therefore, whether something constitutes a luxury is

irrelevant for fraudulent transfer purposes.  Furthermore, if what a deposit is

spent on falls in between the categories of necessities and luxuries, that is it is

neither a necessity nor a luxury, then such deposit may constitute a constructive

fraudulent transfer because it was not spent on a necessity.

This Court also does not agree, within the context of the instant matter,

that, with respect to those deposits in question that are determined to constitute

avoidable fraudulent transfers, Mrs. Arbogast cannot be deemed to have been a

transferee of such deposits from which a recovery can be had unless (a) she is

the one who actually spent such deposits, and (b) that which was purchased with

such deposits actually benefitted her.  The Court concludes instead that Mrs.

Arbogast was a transferee, indeed an initial transferee along with the Debtor, of

all of the direct deposits of the Debtor's individual compensation into the

Entireties Checking Account, regardless of whether (a) she is the one who later

spent such deposits, and (b) that which was purchased with such deposits

actually benefitted her.

The preceding holding by the Court is ultimately dictated by binding

Pennsylvania precedent, whereas the corresponding holding in the Titus

Decisions is not based on any existing authority.  The binding Pennsylvania

precedent to which this Court refers is the Pennsylvania Supreme Court decision

23

in In re Estate of Holmes, 200 A.2d 745 (Pa. 1964), wherein it was held, in

pertinent part, that "[w]here ... an account is placed in the names of a husband

and wife, a gift and the creation of an estate by the entireties is presumed even

though the funds used ... to establish the account were exclusively those of the

husband." Id. at 747; see also Constitution Bank v. Olson, 620 A.2d 1146, 1149-

50 (Pa.Super.Ct. 1993) (relying heavily on Holmes); In re Nam, 257 B.R. 749,

761-62 (Bankr.E.D.Pa. 2000) (relying on both Holmes and Constitution Bank,

and holding that a joint bank account in the names of the debtor therein and his

wife "is presumed to be owned by ... [them] as tenants by the entireties").

Because of such precedent as established in Holmes, money placed by one

spouse in a joint bank account held in the names of both spouses is thereafter

owned by each spouse as a tenant by the entirety, the statutory rule in 20

Pa.C.S.A. § 6303(a) notwithstanding.  20 Pa.C.S.A. § 6303(a) provides that "[a]

joint account belongs, during the lifetime of all parties, to the parties in proportion

to the net contributions by each to the sum on deposit, unless there is clear and

convincing evidence of a different intent."  20 Pa.C.S.A. § 6303(a) (Purdon's

2011) (emphasis added).  However, a spouse's act of placing money in a joint

bank account held in the names of both spouses "constitutes such clear and

convincing evidence of a different intent: the intent to create estates by the

entireties, which arises as a presumption at law." In re Estate of Cambest, 756

A.2d 45, 53 (Pa.Super.Ct. 2000) (citing Constitution Bank).  Because Mrs.

Arbogast owned all of the direct deposits of the Debtor's individual compensation

that were made into the Entireties Checking Account the moment such deposits

24

occurred, she was a transferee along with the Debtor (both as entireties tenants)

of all of such deposits.  *See* In re Broadview Lumber Co., Inc., 168 B.R. 941,

962-63 (Bankr.W.D.Mo. 1994);[3] In re Computer Personalities Systems, Inc., 2002

WL 31988134 at 7 (Bankr.E.D.Pa. 2002); In re Dawley, 2005 WL 2077074 at 15

(Bankr.E.D.Pa. 2005).

**(ii)      Whether the Titus Decisions must be followed in the instant
matter?**

Although this Court, as just set forth, takes issue with many of the basic

rulings in the Titus Decisions, is this Court nevertheless bound to adhere to such

rulings when resolving the instant matter?  The Court concludes that it is not so

bound, and notwithstanding that Judge McCullough, the predecessor judge in the

instant adversary proceeding, may perhaps have indicated his willingness to

follow the Titus Decisions when resolving the instant matter via interlocutory

rulings that were rendered prior to trial.  The Court identifies several reasons why

it is not bound to adhere to the rulings in the Titus Decisions when resolving the

instant matter.

First, the Titus Decisions cannot be accorded preclusive effect, be it by

virtue of the doctrines of res judicata, collateral estoppel, or Rooker-Feldman,

---

[3]The spouse of the president of the debtor in Broadview Lumber, in
contrast to Mrs. Arbogast, was held therein to be a mediate transferee of funds
placed into a joint bank account by said president rather than an initial transferee
of such funds.  That is because said president was determined to be the initial
transferee of such funds from the debtor in Broadview Lumber.  Such difference
between Broadview Lumber and the instant matter, however, does not provide a
point for distinction since such spouse in Broadview Lumber was nevertheless
held to be a transferee therein because she owned the deposits made into the
joint account therein from the moment such deposits occurred.

and not even with respect to the named defendants therein, that is Paul and

Bonnie Titus, because such decisions (a) were rendered at the pre-trial stage

within the Titus Action, (b) did not completely resolve any, and most certainly did

not completely resolve all, of Trizec's claims that are presently being pursued in

such action, and (c) are thus clearly not final in nature.

Second, even if the Titus Decisions could be accorded preclusive effect

outside of bankruptcy by way of res judicata, collateral estoppel, or the Rooker-

Feldman doctrine, and presuming *arguendo* that, given the general relaxation of

the requirement of mutuality of estoppel, such preclusive effect could then be

raised by the Debtor and Mrs. Arbogast in the Arbogast Fraudulent Transfer

Action outside of bankruptcy, such decisions nevertheless cannot operate to so

preclude the Trustee from pursuing the Arbogast Fraudulent Transfer Action

given that she was neither a party, nor in privity with a party, to the Titus Action

when the Titus Decisions were rendered.  *See* In re Cowden, 337 B.R. 512, 531

& 540-41 (Bankr.W.D.Pa. 2006) (citing In re Marlar, 252 B.R. 743, 757-58 (B.A.P.

8th Cir. 2000), and In re Shuman, 78 B.R. 254, 256 (B.A.P. 9th Cir. 1987), and

holding that the Chapter 7 trustee therein was not precluded, either by way of res

judicata, collateral estoppel, or the Rooker-Feldman doctrine, from prosecuting a

fraudulent conveyance action that was originally commenced outside of

bankruptcy by a creditor because such trustee lacked privity with such creditor).

The Court holds that the Trustee was, and is, not in privity with Trizec, who is the

entity that she succeeded as plaintiff in the instant matter and who was also the

plaintiff in the Titus Action, because (a) the Trustee represents not only the

interests of Trizec, as an unsecured creditor in the instant bankruptcy case, but also the interests of the rest of the Debtor's creditor body,[4] (b) the rest of such creditor body was not in privity with Trizec, and (c) Trizec thus represented neither such creditor body nor, therefore, the Trustee at any time while the Titus Decisions were being rendered in the Titus Action.  *See* Id.

Third, the rulings in the Titus Decisions cannot constitute law of the case in the instant matter (a) because "[t]he doctrine [of law of the case] only applies within the same case – an identical issue decided in a separate action does not qualify as law of the case," Farina v. Nokia, Inc., 625 F.3d 97, 117 n.21 (3rd Cir. 2010), and (b) since, as the Court understands it, such rulings were never extended, by any written order of the Common Pleas Court, to the Arbogast Fraudulent Transfer Action prior to its removal to this Court.  In fact, because both of the Titus Decisions were rendered during the period when the Arbogast Fraudulent Transfer Action had been discontinued in the Common Pleas Court, and since such discontinuation, as set forth above, was never legally stricken before such action was removed to this Court, the Common Pleas Court literally never had an opportunity to formally extend such decisions to such action.

Fourth, and of course, the rulings in the Titus Decisions do not constitute law of the district or anything like that because, quite simply, there is no such thing, especially with respect to interlocutory rulings like those rendered in the

---

[4]An examination of the Debtor's Bankruptcy Schedules D & F reveals that at least several unsecured creditors of the Debtor existed at the time of bankruptcy filing other than those who have potential claims against the Debtor for indemnity or contribution arising out of the Lease Litigation.

27

Titus Decisions.

Fifth, even if the rulings in the Titus Decisions can somehow be considered to constitute law of the case in the instant matter, the law of the case doctrine contains exceptions, one of which most notably is to correct glaring errors in the law.  *See* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure *Jurisdiction* § 4478.1 (2nd ed. 2011) (pointing out that the law of the case doctrine does not prevent a trial court from reconsidering its own interlocutory rulings or the interlocutory rulings of a predecessor judge); Schultz v. Onan Corp., 737 F.2d 339, 345 (3rd Cir. 1984) (noting that an exception to the law of the case doctrine applies if a prior decision is clearly erroneous and would work a manifest injustice, and holding that "[t]he doctrine is not a 'barrier to correction of judicial error'").  This Court holds, for the reasons already expressed above, that (a) the rulings in the Titus Decisions are clearly erroneous, (b) such rulings would work a manifest injustice if they were to be applied in the instant matter, and (c) an application of the law of the case doctrine to the Titus Decisions thus does not dictate that this Court must adhere to such decisions when resolving the instant matter.

Sixth, any interlocutory ruling that Judge McCullough may have made during the pre-trial phase of the instant adversary proceeding whereby he indicated his willingness to follow the rulings in the Titus Decisions is also not entitled to preclusive effect in the instant matter – via any of the doctrines of res judicata, collateral estoppel, or Rooker-Feldman – given that such rulings were necessarily interlocutory and, thus, not final in nature.

28

Seventh, even though any such interlocutory ruling by Judge McCullough, if one or more was made, can be considered to constitute law of the case, once again this Court need not follow such interlocutory ruling given, as set forth above, the exception to the law of the case doctrine to correct glaring errors.

### (iii)   The law to be followed in the instant adversary proceeding.

The Court now decrees that, with but one exception to be noted shortly, it adopts as the law that will control the resolution of the instant matter the detailed legal principles as set forth in Meinen regarding the intersection of fraudulent transfer law in Pennsylvania (and, in particular, such law as set forth in Pennsylvania's version of the Uniform Fraudulent Transfer Act) and a debtor's deposit of his or her own funds into a bank account that is owned jointly with his or her spouse as tenants by the entireties.  Therefore, and for all of the foregoing reasons as just set forth herein in the immediately preceding parts (i) and (ii), the Court respectfully will not follow the Titus Decisions when resolving the instant matter, and notwithstanding that Judge McCullough may have indicated his willingness to follow them when resolving the instant matter via interlocutory rulings that were rendered prior to trial.

Consistent with Meinen, the Court holds that the direct deposits of the Debtor's individual compensation into the Entireties Checking Account may constitute fraudulent transfers, at least constructive fraudulent transfers, unless they were spent on necessities.  Therefore, it is irrelevant to the issue of whether such deposits constitute constructive fraudulent transfers that they were not spent on luxuries; that is, even if such deposits were not spent on luxuries, they

29

may still constitute constructive fraudulent transfers if they were not spent on necessities.  Consistent with <u>Meinen</u>, such direct deposits may also constitute constructive fraudulent transfers if they were used by the Debtor and Mrs. Arbogast to purchase other assets which are presently held as entireties property by them, regardless of their necessity to the Debtor and Mrs. Arbogast.

The Court also holds that Mrs. Arbogast was an initial transferee along with the Debtor of all of the direct deposits of the Debtor's individual compensation into the Entireties Checking Account from the moment that such deposits occurred, regardless of whether (a) she is the one who later spent such deposits, and (b) that which was purchased with such deposits actually benefitted her.  Therefore, to the extent that such deposits are determined to constitute fraudulent transfers, the Trustee, pursuant to § 550(a)(1), may recover the value of such transfers from either the Debtor or Mrs. Arbogast.  What that means is that, by virtue of the Trustee's entitlement under § 550(a)(1) to so recover such value, she may obtain a joint and several money judgment against both the Debtor and Mrs. Arbogast in the amount of such value.  *See* <u>Computer Personalities Systems</u>, 2002 WL 31988134 at 7 ("Having found that each Defendant is liable for the full amount of the Transfers, it is appropriate that joint and several liability should attach for $155,000"); <u>Dawley</u>, 2005 WL 2077074 at 15 (imposing a judgment against Mrs. Dawley severally that will reach her individual assets to remedy a transfer of property that was made by Mr. Dawley to both of them as tenants by the entirety).  Such money judgment, of course, may be satisfied either from (a) entireties property that the Debtor and Mrs.

30

Arbogast own, (b) property that is individually owned by the Debtor, and/or (c)

property that is individually owned by Mrs. Arbogast.

With respect to a recovery from the Debtor at this time, the Court is fully

aware that the Debtor has already received his Chapter 7 discharge and that, by

virtue of such discharge and 11 U.S.C. § 524, recovery may no longer be had

against the Debtor on any pre-petition claim against him. However, because the

Trustee is prosecuting the instant matter, that is the Arbogast Fraudulent

Transfer Action, post-petition pursuant to § 544(b)(1), such lawsuit has, as of the

commencement of the instant bankruptcy case, been transformed into a

bankruptcy cause of action. Bankruptcy causes of action, because they can only

be brought post-petition, are necessarily then not pre-petition claims. The

relevance of these preceding points to the present discussion is that the Debtor's

Chapter 7 discharge will not operate to discharge him from any liability that might

now be imposed upon him within the context of the Arbogast Fraudulent Transfer

Action. Consequently, the Debtor's Chapter 7 discharge and § 524 will not

operate to bar the entry of a money judgment against the Debtor at this time via

§ 550(a)(1) within the context of the instant matter. *See* In re Loomer, 198 B.R.

755, 758 (Bankr.D.Neb. 1996) (post-petition recovery can be had against debtors

in bankruptcy on bankruptcy causes of action pursuant to § 550(a)(1)).

The Court notes that the foregoing statement of the law is consistent with

what has been pled in the complaint that commenced the Arbogast Fraudulent

Transfer Action. The Court also observes that such complaint was never

amended, either in the Common Pleas Court prior to such action's removal to

31

this Court or in this Court subsequent to such removal.

**(iv)** **Burden of proof.**

As just set forth, this Court identifies one aspect of the <u>Meinen</u> decision

that it cannot follow when resolving the instant matter.  Such aspect regards the

placement of the burden of proof with respect to whether a debtor's deposits of

his or her own funds into an entireties bank account were (a) used to satisfy

necessities, and/or (b) spent on other assets that are presently owned as

entireties property.

<u>Meinen</u> imposes on constructive fraudulent transfer action defendants the

burden of proving that such bank deposits were used to satisfy necessities and

were not spent on other assets that are presently held as entireties property,

failing which such deposits may be classified as constructive fraudulent transfers.

*See* <u>Meinen</u>, 232 B.R. at 843.  <u>Meinen</u> imposes such burden of proof on

constructive fraudulent transfer action defendants because the <u>Meinen</u> court

operated under the presumption that such defendants' use of such bank deposits

to satisfy necessities constitutes an affirmative defense of such defendants.  *See*

<u>Id.</u> at 842.

After considering Committee Comment 6 to 12 Pa.C.S.A. § 5102 and case

authority that discusses the import of such comment, this Court holds, albeit

somewhat reluctantly, that Pennsylvania's version of the Uniform Fraudulent

Transfer Act imposes on a constructive fraudulent transfer action plaintiff the

burden of proving – as part of its prima facie case that reasonably equivalent

value was not returned – that relevant bank deposits either were not used to

32

satisfy necessities or were spent on other assets that are presently held as entireties property.  *See* 12 Pa.C.S.A. § 5102, Committee Cmt. 6 (1993); <u>Fidelity Bond and Mortgage Co. v. Brand</u>, 371 B.R. 708, 716-21 (E.D.Pa. 2007); <u>Castle Cheese, Inc. v. MS Produce, Inc.</u>, 2008 WL 4372856 at 22-24 (W.D.Pa. 2008). Therefore, the Trustee, in order to prevail on her constructive fraudulent transfer counts in the instant matter, must preponderantly prove that the direct deposits of the Debtor's compensation into the Entireties Checking Account either (a) were not used to satisfy necessities, or (b) were spent on other assets that are presently held as entireties property.

That being said, the Court can and will impose on constructive fraudulent transfer defendants, herein the Debtor and Mrs. Arbogast, the burden of producing at least some useful evidence regarding what the funds deposited into an entireties bank account are ultimately spent on; the precision regarding such evidence will necessarily vary depending upon the circumstances.  Shifting the burden of producing evidence is not the same thing as shifting the burden of persuasion (i.e., the ultimate burden of proof), thus does not run afoul in any way of the authorities just cited that discuss the aforesaid Committee Comment 6, and is appropriate given that constructive fraudulent transfer defendants will often possess complete control over information as to the ultimate use of bank deposits.

33

C.      **Other threshold issues to be resolved.**

**(i)      What is a necessity?**

Much contention between the parties has been generated by the issue of

what constitutes a necessity or, put more accurately, a reasonable and

necessary household expense of a debtor.  The Debtor and Mrs. Arbogast

maintain that, for fraudulent transfer law purposes in Pennsylvania, the term

"necessities" and the phrase "reasonable and necessary household expenses of

a debtor" are to be equated with the term "necessaries" as that term is used

within both Pennsylvania's common law doctrine of "necessaries" and 23

Pa.C.S.A. § 4102, which statutory provision essentially codifies the foregoing

doctrine of "necessaries."

"The doctrine of necessaries is a judicially created doctrine that invokes

liability on a spouse for the goods provided to the other spouse or the family

despite the absence of any express written consent."  21 <u>Standard Pennsylvania</u>

<u>Practice</u> 2d § 116:16 (2011).

It is now provided by statute [(i.e., § 4102)] that in all cases

where debts are contracted for necessaries by either spouse for the

support and maintenance of the family, it is lawful for the creditor to

institute suit against the husband and wife for the price of such

necessaries and, after obtaining a judgment, have an execution

against the contracting spouse alone.  If no property of that spouse

is found, execution may be levied on and satisfied out of the

34

separate property of the other spouse.

Id.  It has been held that

>  [t]he scope of 'necessaries' for purposes of this provision
>
>  [(i.e., § 4102)] is not restricted to what may be considered the bare
>
>  essentials required to hold body and soul together.  Things required
>
>  for and suitable in light of the rank and position of the spouses to
>
>  maintain their lifestyle are also included.  The kind and amount of
>
>  such necessaries is to be determined on a case-by-case basis by
>
>  considering the means, ability, social position and circumstances of
>
>  both spouses.

In re O'Lexa, 317 B.R. 290, 294 (Bankr.W.D.Pa. 2004) (citing Gimbel Brothers,
Inc. v. Pinto, 145 A.2d 865, 869 (Pa.Super.Ct. 1958)).

The Debtor and Mrs. Arbogast contend, consistent with the foregoing law,
that, for Pennsylvania fraudulent transfer law purposes, an expenditure
constitutes a necessity if, in light of the rank and position of a judgment debtor
and his or her spouse, such expenditure is necessary to maintain the lifestyle
that they enjoyed prior to the emergence of a creditor claim (or, perhaps more
appropriately, prior to the beginning of a fraudulent transfer lookback period).
Put differently, according to the Debtor and Mrs. Arbogast, whether an
expenditure constitutes a necessity or not, for fraudulent transfer law purposes,
must be determined by comparing the lifestyle of a judgment debtor and his or
her spouse prior to and after the beginning of a fraudulent transfer lookback
period; only if such expenditure had the effect of improving such lifestyle would

35

such expenditure not constitute a necessity.  For several reasons, the Court rejects such position of the Debtor and Mrs. Arbogast.

First, the O'Lexa decision, and Gimbel Brothers upon which O'Lexa relies, are not fraudulent transfer cases.  Therefore, they cannot properly be cited as supportive of the proposition that the Debtor and Mrs. Arbogast advance, namely that what constitutes a necessity for fraudulent transfer purposes is the same as what constitutes a necessary within the doctrine of necessaries.  Second, the Court is unaware of the existence of any other Pennsylvania case authority – the Meinen decision and the cases cited therein included – that would support the position of the Debtor and Mrs. Arbogast.

Third, the Court is aware of cases in other jurisdictions that have dealt with precisely the issue just raised, and they all appear to reject the position of the Debtor and Mrs. Arbogast, that is they decline to hold that what constitutes a necessity for fraudulent transfer purposes is the same as what constitutes a necessary within the doctrine of necessaries.  *See* Cruickshank-Wallace v. County Banking and Trust Co., 885 A.2d 403, 424 (Md.Ct.Spec.App. 2005) (holding, even after the common law doctrine of necessaries had been abolished in Maryland, that the husband therein did not receive fair consideration from the wife therein for constructive fraudulent transfer purposes even if said wife used the money that said husband transferred into her bank account for necessaries), *abrogated by* Wal Mart Stores, Inc. v. Holmes, 7 A.3d 13 (Md. 2010) (abrogating out of what appears to be an abundance of caution, see discussion at 31-32); United States v. Mazzeo, 306 F.Supp.2d 294, 309-10 (E.D.N.Y. 2004) (same),

*vacated as moot*, 2004 WL 3079366.

Fourth, the Court chooses to reject the position of the Debtor and Mrs. Arbogast regarding what constitutes a necessity because to do otherwise, that is to determine what is a necessity for fraudulent transfer purposes by using a sliding scale standard that is tailored to the preexisting lifestyle of a judgment debtor and his or her spouse, will allow such judgment debtor to avoid too easily the reach of, that is to essentially abuse, fraudulent transfer laws.  Indeed, the Debtor and Mrs. Arbogast rely upon the <u>Gimbel Brothers</u> decision to support their position that a necessity is to be determined by resort to the caselaw regarding the doctrine of necessaries, yet in <u>Gimbel Brothers</u> it was determined that a mink coat constituted a necessary!  Sanctioning the use of a standard that could compel a result similar to that which was reached in <u>Gimbel Brothers</u> within the context of fraudulent transfer law, this Court holds, is simply something that is too perverse to consider when undertaking to decide whether something constitutes a necessity.

Having decided that a necessity for fraudulent transfer purposes is not to be equated with what constitutes a necessary within the doctrine of necessaries, can the Court offer any guidance as to what is a necessity?  The Court finds that little guidance really can be offered as to the meaning of such term.  The Court will certainly apply the dictionary definition of the term "necessity."  As well, the Court repeats the point, already made earlier herein wherein the Court relied upon case authorities regarding § 523(a)(2)(C), that just because an expenditure does not constitute a luxury, that does not necessarily mean that such

37

expenditure will constitute a necessity; put differently, many expenditures will fall

between the extremes of necessity and luxury and, if such expenditures fall

somewhere in between such extremes, *they will not constitute a necessity.*

Finally, the Court, when endeavoring to ascertain whether an expenditure

constitutes a necessity, believes that it is inappropriate to consider the rank and

social position of a judgment debtor and his or her spouse – i.e., such decision

should not be made by utilizing a sliding scale standard predicated on the

preexisting lifestyle of such judgment debtor and his or her spouse.  Instead,

factors that are fair game for a court to consider when making a determination

regarding whether something constitutes a necessity would include the number

of people in such judgment debtor's household, any adverse medical condition of

a household member, and the cost of living in the general geographic area where

such debtor resides.

**(ii)    Whether the direct deposits constitute transfers by the Debtor
in the first instance?**

12 Pa.C.S.A. §§ 5104(a) and 5105 both require, before a transfer can be

avoided as fraudulent thereunder, that such transfer have been made by the

debtor.  Therefore, another threshold issue that must be resolved in the instant

matter is whether the direct deposits of the Debtor's individual compensation into

the Entireties Checking Account constitute transfers that were made by the

Debtor.  The Debtor and Mrs. Arbogast predictably argue that such direct

deposits do not constitute transfers that were made by the Debtor, while the

Trustee contends otherwise.

38

Pennsylvania's version of the Uniform Fraudulent Transfer Act defines a "transfer," in pertinent part, as "[e]very mode, direct or indirect, ... of disposing of or parting with an asset or an interest in an asset."  12 Pa.C.S.A. § 5101(b) (Purdon's 2011).  Not included as an asset, however, is (a) "property to the extent [that] it is generally exempt under nonbankruptcy law," and (b) entireties property "to the extent [that] it is not subject to process by a creditor holding a claim against only one tenant."  Id.  42 Pa.C.S.A. § 8127(a) provides generally that "[t]he wages, salaries and commissions of individuals shall while in the hands of the employer be exempt from any attachment, execution or other process."  42 Pa.C.S.A. § 8127(a) (Purdon's 2011).

Because of the foregoing statutory provisions, and since the Schnader Law Firm deposited the Debtor's salary[5] directly into the Entireties Checking Account rather than physically place such salary into the Debtor's hands so that he could then physically deposit the same into such bank account himself, the Debtor and Mrs. Arbogast make what the Court understands to be several discrete arguments.  First, they argue that the Debtor's wages were never transferred by anyone, let alone the Debtor, within the meaning of § 5101(b) and for purposes of §§ 5104(a) and 5105, because such wages were exempt in the hands of the Schnader Law Firm and, thus, such wages never constituted an asset of the Debtor.  Second, they perhaps contend that, even if the Debtor's

---

[5]For purposes of resolving the Arbogast Fraudulent Transfer Action, the Court will presume that what the Debtor received from the Schnader Law Firm in the form of compensation constituted wages or salary.

39

wages were somehow so transferred, they were nevertheless transferred by the Schnader Law Firm rather than the Debtor since they were never physically placed into the Debtor's hands.

The foregoing arguments, the Court concludes, fail (a) because, the Court holds in turn, the direct deposits constitute indirect transfers by the Debtor himself of his salary into the Entireties Checking Account, and (b) given the language of § 5101(b), which statutory provision expressly provides that indirect transfers, or indirect modes of disposing of or parting with an asset, constitute transfers for purposes of §§ 5104(a) and 5105, see In re Craig, 144 F.3d 587, 592 (8th Cir. 1998) (applying North Dakota's version of the Uniform Fraudulent Transfer Act, which does not differ in any relevant respect from Pennsylvania's version, and holding that such act "defines transfer to include both 'direct and indirect' modes of parting with an asset or interest in an asset"); In re FBN Food Services, Inc., 185 B.R. 265, 272 (N.D.Ill. 1995) (applying the Bankruptcy Code fraudulent transfer provisions at 11 U.S.C. §§ 548(a) and 101(54), which are both similarly worded to and similarly construed with the relevant UFTA provisions at issue herein, and holding that "'a transfer does not have to be made directly by a debtor' in order to fall within the ambit of the statute"); In re 1634 Associates, 157 B.R. 231, 234 (Bankr.S.D.N.Y. 1993) (same, applying the Bankruptcy Code fraudulent transfer provisions at 11 U.S.C. §§ 548(b) and 101(54), and holding as well that "[h]istorically, the term 'transfer' has been granted a broad interpretation").

Because the Debtor so indirectly transferred his wages, each such indirect

transfer is properly viewed, that is it must be recast, as two discrete transfers,

namely a transfer by the Schnader Law Firm of such wages physically into the

Debtor's hands, and then a transfer physically by the Debtor of such wages into

the Entireties Checking Account.  *See* Craig, 144 F.3d at 592 (quoting Merriam v.

Venida Blouse Corp., 23 F.Supp. 659, 661 (S.D.N.Y. 1938), which recast an

indirect transfer by a debtor as two discrete transfers, the first of which was from

a corporation to the debtor and the second of which was from the debtor to his

wife and daughter; also quoting Merriam to the effect that "'[a] person may not do

by indirection what he is forbidden to do directly'"); *see also* 1634 Associates,

157 B.R. at 234 (holding that "the spirit of § 548(b) [would] be violated if a

general partner was permitted to transfer indirectly what it could not transfer

directly").  Since such direct deposit transactions, as so recast, have the effect of

placing the Debtor's wages physically into his hands,[6] and given that such wages

are not exempt while they rest in his hands, *see* 42 Pa.C.S.A. § 8127(a) (in

Pennsylvania, wages are exempt only while they are in the hands of the

employer); In re Bosack, 454 B.R. 625, 633 (Bankr.W.D.Pa. 2011) (construing

§ 8127(a) similarly by virtue of such statutory provision's express terms), such

wages constitute an asset within the meaning of § 5101(b) that can then be the

subject of a transfer by him, also within the meaning of § 5101(b) and for

purposes of §§ 5104(a) and 5105.

---

[6]Essentially because indirect transfers are recast as such, "[t]he Uniform
Fraudulent Transfer Act ... does not require that the debtor physically possess
the asset" that such debtor is deemed to have indirectly transferred.  Craig, 144
F.3d at 593; *see also* FBN Food Services, 185 B.R. at 273 (same).

Therefore, the direct deposits of the Debtor's individual compensation into

the Entireties Checking Account constitute transfers that the Debtor made

himself for purposes of §§ 5104(a) and 5105, notwithstanding that the Debtor

made such transfers indirectly.[7]

---

[7]The Court is aware of a couple of decisions from jurisdictions other than
Pennsylvania that have been cited, either by the Debtor and Mrs. Arbogast or by
similarly situated parties in other adversary proceedings that are presently
pending before this Court, in support of the position that deposits of wages by an
employer directly into an employee's bank account that is held by such employee
as a tenant by the entirety do not constitute transfers for purposes of §§ 5104(a)
and 5105. Those decisions are Daugherty v. Central Trust Co. of Northeastern
Ohio, N.A., 504 N.E.2d 1100 (Ohio 1986), and Goebel v. Brandley, 174 S.W.3d
359 (Tex.App. 2005). Such decisions, as a threshold matter, are, of course, not
binding on this Court. The Court also finds, as explained below, that both such
decisions are distinguishable from the instant matter involving the Debtor and
Mrs. Arbogast.

The Daugherty court held that, in Ohio, "personal earnings exempt from
execution [while in the possession of an employer] ... retain their exempt status
when deposited in a personal checking account, so long as the source of the
exempt funds is known or reasonably traceable." Daugherty, 504 N.E.2d at
1103. An undoubtable corollary of such decision in Daugherty is that wages, to
the extent that they are traceable as such, remain exempt in Ohio while merely in
the hands of an employee, either before deposit into a bank account or
regardless of any such future deposit. Such result in Ohio is at odds with the
law, that is it would not occur, in Pennsylvania because, as set forth earlier
herein, in Pennsylvania wages are exempt only while they are in the hands of the
employer. Therefore, that a transfer of wages by an employee in Ohio, either
directly or indirectly, might not constitute a transfer for purposes of the Uniform
Fraudulent Transfer Act in Ohio does not compel a similar result in Pennsylvania
for purposes of Pennsylvania's version of such law.

Goebel involved indirect transfers of wages by an employee in Texas for
the purchase of savings bonds for her children. In Texas, as in Ohio and
Pennsylvania, wages are exempt while in the hands of an employer. See
Goebel, 174 S.W.3d at 363-64. The Goebel court ultimately held that the indirect
transfers at issue therein did not constitute transfers for purposes of Texas'
Uniform Fraudulent Transfer Act. See Id. at 366. In the process of so holding,
the Goebel court pointed out (a) that, after the amendment in 1989 of a Texas
statute, proceeds of, or disbursements from, exempt property in Texas
essentially retain the exempt status of such property in Texas, presumably if
such proceeds or disbursements can properly be traced, and (b) that wages in

**D.    Actual fraudulent transfer action, § 5104(a)(1).**

In order for the Trustee to prevail on her action under § 5104(a)(1), which

action constitutes the first count in her complaint, she must preponderantly prove

that the Debtor transferred his wages into the Entireties Checking Account –

indirectly, as just set forth herein – with actual intent to hinder, delay, or defraud

at least one of his creditors.

The Trustee contends that the creditor who the Debtor sought to so

hinder, delay, or defraud was Trizec.  The Trustee suggests as the motive for

such bad action by the Debtor that he had a desire to avoid having to satisfy any

part of the Lease Litigation judgment that Trizec ultimately obtained against him

on June 7, 2006.

12 Pa.C.S.A. § 5104(b) provides a number of different factors for a court

to consider when endeavoring to ascertain whether a debtor possessed actual

bad intent in making a transfer.  The Court finds that some of those factors are

present, or are satisfied, with respect to the Debtor's transfers of his salary into

---

Texas, therefore, upon their receipt by an employee do not lose their status as
exempt.  *See* Id. at 364-65.  That being the case, an employee's transfer of such
wages, either directly or indirectly, cannot constitute a transfer for purposes of
Texas' Uniform Fraudulent Transfer Act.  *See* Id. at 366.  Such result in Texas is
very similar to that which is reached in Ohio.  Unfortunately for the Debtor and
Mrs. Arbogast, as well as those other litigants to which the Court referred at the
outset of the instant footnote, the result in Ohio is very different from that which is
compelled by Pennsylvania law – i.e., in Pennsylvania wages, upon their receipt
by an employee, immediately lose their exempt status.  Therefore, that a transfer
of wages by an employee in Texas, either directly or indirectly, might not
constitute a transfer for purposes of Texas' Uniform Fraudulent Transfer Act does
not compel a similar result in Pennsylvania for purposes of Pennsylvania's
version of such law.

the Entireties Checking Account.

For instance, § 5104(b)(1) is satisfied because the direct deposits of the Debtor's compensation were made into the Entireties Checking Account, which account was owned by the Debtor and Mrs. Arbogast, who would both certainly be insiders of the Debtor himself. Because such direct deposits were made into an entireties bank account, the Debtor obviously retained possession and/or control over them subsequent to such deposits, thereby satisfying § 5104(b)(2). Trizec commenced the Lease Litigation against, *inter alia*, the Debtor in July 2000. Such date precedes when all of the transfers occurred that, by virtue of the Arbogast Fraudulent Transfer Action, are sought to be avoided as fraudulent. As a result thereof, § 5104(b)(4) is satisfied. As held elsewhere within the instant opinion, the factors described in § 5104(b)(8) – (10) are also met in the instant matter.

That many of the factors set forth in § 5104(b) are satisfied, however, does not satisfy the Court – i.e., does not operate so that the Trustee preponderantly proves – that the Debtor intended to hinder, delay, or defraud Trizec when he transferred his wages into the Entireties Checking Account. The Court cannot find that the Debtor had the requisite bad intent when he transferred his salary into the Entireties Checking Account because:

(a)     the Debtor indisputably had been directly depositing his wages into an entireties bank account for a long period of time prior to July 2000, which date is when Trizec first began to pursue the Debtor via the Lease Litigation;

44

(b)     there was not sufficient evidence produced at trial to establish that the

Debtor continued to directly deposit his salary into the Entireties Checking

Account after July 2000 so as to avoid Trizec's reach; and

(c)     no evidence was produced at trial to establish that, before Trizec

commenced the Arbogast Fraudulent Transfer Action on April 23, 2007,

the Debtor was even aware that his direct deposits of his wages into the

Entireties Checking Account might conceivably constitute fraudulent

transfers.

Therefore, the Court declines to find that the Debtor acted with actual

intent to hinder, delay, or defraud Trizec when he directly deposited his salary

into the Entireties Checking Account.  Consequently, judgment shall be rendered

in favor of the Debtor and Mrs. Arbogast with respect to the Trustee's actual

fraudulent transfer action under § 5104(a)(1), that is the Trustee's first count in

her complaint.

### E.     Constructive fraudulent transfer actions, §§ 5104(a)(2)(ii) and 5105.

In order for the Trustee to prevail on her actions under §§ 5104(a)(2)(ii)

and 5105, which actions constitute the second and third counts in her complaint,

she must preponderantly prove that (a) the Debtor did not receive a reasonably

equivalent value in exchange for the periodic transfers (i.e., the direct deposits)

of his wages into the Entireties Checking Account, and (b) he was either

insolvent at the time of, or was rendered insolvent by, such transfers.[8]

### (i)     Whether the Debtor received reasonably equivalent value?

As set forth earlier herein, the Court holds that the direct deposits of the Debtor's salary into the Entireties Checking Account may constitute constructive fraudulent transfers (a) unless they were spent on necessities, or (b) if they were used by the Debtor and Mrs. Arbogast to purchase other assets which are presently held as entireties property by them, regardless of their necessity to the Debtor and Mrs. Arbogast.  A corollary of the preceding holding is that the Debtor did not receive reasonably equivalent value in return for such direct deposits (a) unless they were subsequently spent on necessities, or (b) if they were subsequently used by the Debtor and Mrs. Arbogast to purchase other entireties property.  *See* Meinen, 232 B.R. at 842-43.

As also set forth earlier herein, the Trustee bears the burden of proving that the Debtor did not receive reasonably equivalent value in return for such direct deposits.  That means that the Trustee, in order to prevail on her constructive fraudulent conveyance counts, must preponderantly prove that such deposits either (a) were not spent on necessities, or (b) were spent on other entireties assets.

The Trustee, as set forth at the outset of the instant opinion, contends that

---

[8]To be more precise, the Trustee, with respect to the issue of insolvency, must prove either (a) that the Debtor was insolvent at the time of, or was rendered insolvent by, the direct deposits (§ 5105), or (b) that the Debtor, while such direct deposits were being made, intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due (§ 5104(a)(2)(ii)).

(a) four or five groups of disbursements were made from the Entireties Checking Account, (b) the direct deposits of the Debtor's wages were the source of the money in such account that funded such disbursements, and (c) such deposits constitute fraudulent transfers to the extent that they were utilized to fund such disbursements.  Reconciling all of the foregoing, the Trustee, in order to prevail in the instant matter, must preponderantly prove (a) that such disbursements were actually made out of the Entireties Checking Account, (b) that such direct deposits funded such disbursements, and (c) that, even if such disbursements were actually made and so funded, they were also utilized either on things that did not constitute necessities or on other assets that the Debtor and Mrs. Arbogast hold as entireties assets.

**(a)**     **$338,375.31 in checks drawn on Mrs. Arbogast's Sole Account.**

The first group of disbursements at issue are the $338,375.31 of disbursements that are alleged to have been made from the Entireties Checking Account and placed into Mrs. Arbogast's Sole Account, from which sole account Mrs. Arbogast is then alleged to have purchased things other than necessities. The Debtor and Mrs. Arbogast concede that Mrs. Arbogast wrote $338,375.31 worth of checks drawn on her Sole Account.  However, they dispute that the source of the funds in her Sole Account that served to cover such checks came from the Entireties Checking Account.

The Court finds that it is as likely as not that the money that Mrs. Arbogast spent out of her Sole Account came from sources other than the Entireties Checking Account, such as her own money.  Therefore, the Trustee has not

47

preponderantly proven that any of the direct deposits of the Debtor's wages into

the Entireties Checking Account were ultimately transferred into Mrs. Arbogast's

Sole Account and then used to cover the $338,375.31 worth of checks that she

wrote upon such account.  Accordingly, the Trustee cannot obtain a recovery

against the Debtor and/or Mrs. Arbogast for said $338,375.31.

      **(b)**      **Alleged disbursements re: Florida Residence.**

The second group of disbursements at issue are those that were allegedly

made with respect to the Florida Residence.  Dealing first with the $70,000 down

payment that was made on the Florida Residence, the Court finds that all of such

$70,000 was paid out of the Entireties Checking Account.  However, the Trustee

has not preponderantly proven that $65,000 of such $70,000 was placed into the

Entireties Checking Account as a result of direct deposits of the Debtor's salary.

Instead, it appears that such $65,000 emanated from other exempt or entireties

assets, and that it was then placed into the Entireties Checking Account.

Therefore, such $65,000 is not recoverable as a fraudulent transfer.

The Trustee has preponderantly proven that the other $5,000 portion of

such down payment was funded by direct deposits of the Debtor's salary.  The

Court also holds that such $5,000 is potentially recoverable as a fraudulent

transfer, that is the Debtor did not receive reasonably equivalent value for such

$5,000.  The Court so holds because such amount was applied toward the

purchase of an asset that the Debtor and Mrs. Arbogast concede they presently

own as tenants by the entirety.  The Court also holds that the Florida Residence

does not constitute a necessity because it is a second home for the Debtor and

48

Mrs. Arbogast rather than their primary residence; this point also dictates that the

Debtor did not receive reasonably equivalent value for said $5,000.

Regarding the holding that the Florida Residence is not a necessity, the

Debtor and Mrs. Arbogast maintain that the Florida Residence does not

constitute a luxury because its purchase did no more than allow them to maintain

the lifestyle that they had enjoyed prior to April 23, 2003 (i.e., the beginning of the

lookback period), or even prior to July 2000 (i.e., when Trizec first sued them).

As explained earlier herein, that something does not constitute a luxury is

irrelevant to the issue that must be resolved, that is whether something

constitutes a necessity.  Therefore, the Court can even accept *arguendo* that the

Florida Residence does not constitute a luxury, but the Court still holds that it

also does not constitute a necessity.  To the extent that the Debtor and Mrs.

Arbogast argue that the Florida Residence constitutes a necessity, the Court

simply rejects such argument outright.

The Court deals next with alleged disbursements equalling $103,806.60,

which alleged disbursements were used to (a) make mortgage payments (both

principal and interest) on the loan that was obtained to purchase the Florida

Residence, and (b) pay interest on the loan that was allegedly obtained to make

the $70,000 down payment.  As an initial matter, the Trustee has not

preponderantly proven that a loan actually was obtained to make the $70,000

down payment.  The Trustee alleged that such a loan was obtained, and based

such allegation upon information obtained during discovery.  However, at trial the

Debtor satisfied the Court that no such loan was obtained to make such down

49

payment, which means that interest – apparently in the approximate amount of $243.47 per month – could not have been paid on such loan.

As for the mortgage payments, the Trustee has preponderantly proven that (a) they were made from the Entireties Checking Account, and (b) the amounts from such account that were used to make such payments derived from the direct deposits of the Debtor's wages.  However, the Trustee attempts to recover as fraudulent transfers 62 months worth of mortgage payments, which number of payments is baseless, the Court concludes, for several reasons.  First, as the Court has already determined, the relevant lookback period for the Arbogast Fraudulent Transfer Action is the 48-month period from April 23, 2003, to April 23, 2007.  Because the Trustee has not preponderantly proven that the Debtor and Mrs. Arbogast made more than 48 monthly mortgage payments during such period, the Trustee has no basis for being able to recover more than 48 months worth of mortgage payments.  Second, the Florida Residence was not even purchased until June 2004, which date is part of the way through the aforesaid lookback period.  Not surprisingly, the Trustee has not preponderantly proven that mortgage payments were made between April 23, 2003, and June 2004.  Therefore, the Trustee can only potentially recover as being fraudulent transfers those mortgage payments that were made between July 2004 and April 2007, or 34 mortgage payments.

The Trustee assigns a value of $1,430.83 to each mortgage payment, which value the Court accepts since the parties did not quarrel at trial as to such amount.  The $1,430.83 mortgage payment is split up with $1,075.94 attributed

50

to interest and $354.89 attributed to principal.  The Court holds that the 34

mortgage principal payments that were made between July 2004 and April 2007

are potentially recoverable as fraudulent transfers because they represent

payments made toward the purchase of entireties property.  The 34 mortgage

interest payments, on the other hand, do not represent payments made toward

the purchase of entireties property.  *See* Id. at 843.  Such interest payments

nevertheless are potentially recoverable as fraudulent transfers because they are

attributable to the purchase of an asset that, as set forth above, does not

constitute a necessity.  The total value of the 34 mortgage payments, for which

the Debtor did not receive reasonably equivalent value, equals $48,648.22 (i.e.,

34 x $1,430.83).

The Court undertakes an analysis regarding the $96,605.30 worth of

expenditures that were made for upkeep on the Florida Residence similar in

nature to that which was just done with respect to the mortgage payments that

pertain to such realty.  The Trustee has preponderantly proven that (a) such

maintenance expenditures were made from the Entireties Checking Account, and

(b) the amounts from such account that were used to fund such maintenance

expenditures derived from the direct deposits of the Debtor's wages.  However,

the Trustee once again baselessly attempts to recover as fraudulent transfers 62

months worth of maintenance expenditures.  The Court concludes once again

that the proper number of months worth of maintenance expenditures that are

potentially recoverable as fraudulent transfers equals 34.  The monthly figure that

the Trustee arrived at for such maintenance expenditures is $1,558.15, and the

Court will accept such value as correct given that the parties did not quarrel at trial as to such amount.  Such interest payments are potentially recoverable as fraudulent transfers because they are attributable to the purchase of an asset that, as set forth above, does not constitute a necessity.  The total value of the 34 maintenance expenditure payments, for which the Debtor did not receive reasonably equivalent value, equals $52,977.10 (i.e., 34 x $1,558.15).

Finally, the Debtor and Mrs. Arbogast proved through credible testimony at trial that (a) they rented out the Florida Residence during the years from 2004 through 2006, (b) they received rental income during such period equal to $34,753, and (c) such rental income was deposited into the Entireties Checking Account.  Because such rental income was deposited into the Entireties Checking Account, it served to replace some of the disbursements that were made therefrom which, as set forth above, are potentially recoverable as fraudulent transfers.  Therefore, the Court will subtract such $34,753 amount from such amounts that are potentially recoverable as fraudulent transfers.

Based upon the foregoing analysis respecting the Florida Residence, the Trustee has preponderantly proven that the Debtor did not receive reasonably equivalent value in return for $71,872.32 worth of his wages that were directly deposited into the Entireties Checking Account (i.e., $5,000 + $48,648.22 + $52,977.10 - $34,753).[9]

---

[9]The Court determines, with respect to the Florida Residence, that, if the lookback period for the Arbogast Fraudulent Transfer Action would have been from January 15, 2006, until January 15, 2010, then the Debtor would have failed to receive reasonably equivalent value in return for $123,816.04 worth of his

### (c)   Alleged disbursements for country club memberships.

The next group of disbursements at issue are those that were allegedly

made out of the Entireties Checking Account to maintain memberships in three

different country clubs, namely (a) $26,132.51 for membership in the Duquesne

Club, (b) 60,647.28 for membership in the Long Vue Club, and (c) $42,444.46 for

membership in the Marsh Landing Country Club.  At the outset, the Court holds

that none of the foregoing expenditures regarding country club memberships

constitute necessities.  The Court so holds even if, accepting for the sake of

argument, such country club memberships also do not constitute luxuries.

However, the Trustee attempts to recover an amount that is equal to all of

the disbursements that were made out of the Entireties Checking Account related

to such country club memberships for the period from April 23, 2003, until July 6,

2010.  The Trustee's Trial Exhibits 54 – 56 purport to list all of such

disbursements that occurred between April 23, 2003, and July 6, 2010.  With but

---

salary that was directly deposited into the Entireties Checking Account.  The
Court arrives at such determination because (a) 48, rather than only 34, months
worth of mortgage payments and maintenance expenditures would have been
potentially recoverable had the lookback period been from 1/15/06 to 1/15/10,
and (b) the rental income offset for the period between 1/15/06 and 1/15/10,
according to the Debtor, equals $19,655 rather than the $34,753 figure for the
period from 4/23/03 to 4/23/07.  The $5,000 down payment would not have been
recoverable had the lookback period been from 1/15/06 to 1/15/10 because such
payment occurred in June 2004.  The math would have been as follows if the
lookback period had been from 1/15/06 to 1/15/10:

| | | |
|---|---|---|
| Mortgage Payments: | 48 x $1,430.83 = | $68,679.84 |
| Maintenance Payments: | 48 x $1,558.15 = | $74,791.20 |
| Rental Income Offset: | | ($19,655.00) |
| | | |
| Total | | $123,816.04 |

one exception, the Court accepts that such disbursements were actually made out of the Entireties Checking Account.  Nevertheless, that the Trustee can recover as she seeks to do appears, at least on the surface, to be baseless with respect to those disbursements that occurred subsequent to April 23, 2007, given that the lookback period for the Arbogast Fraudulent Transfer Action ends on April 23, 2007.

The Court suspects – although the Trustee has never formally argued as much – that the position of the Trustee is that:

(a)  some, if not many, of the disbursements that occurred subsequent to April 23, 2007, were actually funded with direct deposits of the Debtor's wages into the Entireties Checking Account that occurred before the end of the lookback period (i.e., prior to April 23, 2007),

(b)  such deposits are avoidable as fraudulent to the extent that they funded disbursements for non-necessities post-April 23, 2007, and

(c)  the Debtor and Mrs. Arbogast bear the burden of proving that post-April 23, 2007 disbursements were not funded with pre-April 23, 2007 direct deposits.

If the foregoing analysis is the position that is taken by the Trustee, then the Court absolutely agrees with it to the extent of the first two prongs of such analysis.  Unfortunately for the Trustee, the Court holds, consistent with its prior rulings regarding the assignment of the burden of proof in the instant matter, that the Trustee bears the burden of preponderantly proving that post-April 23, 2007 disbursements were funded with pre-April 23, 2007 direct deposits.  The Court

concludes that the Trustee has not preponderantly proven as much.

Consequently, the Court would be inclined to rule, without more, that the Trustee

cannot potentially recover at all for any of those disbursements that were made

out of the Entireties Checking Account related to such country club memberships

that occurred subsequent to April 23, 2007.

A related issue arises with respect to those disbursements related to such

country club memberships that occurred immediately subsequent to April 23,

2003 (i.e., the beginning of the lookback period).  In particular, some of such

disbursements were undoubtedly funded with direct deposits into the Entireties

Checking Account that preceded April 23, 2003.  Because it is actually the direct

deposits themselves, rather than the disbursements that were funded thereby,

that can constitute an avoidable fraudulent transfer, the Trustee arguably has

also not preponderantly carried her burden of proof with respect to those

disbursements related to such country club memberships that occurred

immediately subsequent to April 23, 2003.

That being said, the Court finds, after examining the Trustee's Trial

Exhibits 54 – 56, that, at most, a few thousand dollars worth of such

disbursements occurred within the first few months subsequent to both April 23,

2003, and April 23, 2007.  That being the case, it is more likely than not that at

least an equal amount of pre-April 23, 2007 direct deposits funded post-April 23,

2007 disbursements as pre-April 23, 2003 direct deposits funded post-April 23,

2003 disbursements.  Therefore, the Court holds that the Trustee has

preponderantly proven that those disbursements that were made out of the

Entireties Checking Account between April 23, 2003, and April 23, 2007, that relate to such country club memberships derived from the direct deposits of the Debtor's wages.

In light of the foregoing, the Trustee may potentially recover as fraudulent transfers all of those disbursements that are listed in her Trial Exhibits 54 – 56 for the period between April 23, 2003, and April 23, 2007, with but one exception, namely a $13,250 disbursement listed in Trial Exhibit 56 that pertains to the Marsh Landing Country Club membership and is dated November 21, 2006.  The Trustee cannot recover as a fraudulent transfer such disbursement because the Debtor and Mrs. Arbogast have proven that such disbursement came not from the Entireties Checking Account but rather from Mrs. Arbogast's Sole Account; since such disbursement did not come from the Entireties Checking Account, the Trustee has not preponderantly proven that direct deposits of the Debtor's wages served to fund such expenditure.  The evidence upon which the Court bases its finding is not only credible trial testimony of the Debtor but also the Trustee's own Trial Exhibit 51.

The Trustee's Trial Exhibits 54 – 56 reveal that, between April 23, 2003, and April 23, 2007,

(a)     $22,192.12 worth of disbursements were made that pertain to the Duquesne Club;

(b)     $45,252.07 worth of disbursements were made that pertain to the Long Vue Club; and

(c)     $4,072.59 worth of disbursements were made that pertain to the Marsh

Landing Country Club (after subtracting out the aforesaid $13,250

expenditure).

The total of such disbursements equals $71,516.78.

Based upon the foregoing analysis respecting the country club

membership expenditures, the Trustee has preponderantly proven that the

Debtor did not receive reasonably equivalent value in return for $71,516.78 worth

of his wages that were directly deposited into the Entireties Checking Account.[10]

**(d)      Alleged disbursements made for life insurance policies.**

The last group of disbursements to consider within the context of the

Arbogast Fraudulent Transfer Action[11] are the $75,842.42 worth of alleged

disbursements made to fund premium payments made by the Debtor for various

life insurance policies that primarily benefitted Mrs. Arbogast.

At the outset, the Court holds that the purchase of life insurance to benefit

---

[10]The Court determines, with respect to the country club membership
expenditures, that, if the lookback period for the Arbogast Fraudulent Transfer
Action would have been from January 15, 2006, until January 15, 2010, then the
Debtor would have failed to receive reasonably equivalent value in return for
$59,500.57 worth of his salary that was directly deposited into the Entireties
Checking Account.  The Court arrives at such determination because, had the
lookback period been from 1/15/06 to 1/15/10, then the relevant expenditures for
(a) the Duquesne Club would have equalled $9,630.54, (b) the Long Vue Club
would have equalled $24,816.46, (c) the Marsh Landing Country Club would
have equalled $25,053.57 (after subtracting out $13,250), and (d) all three clubs
combined would have equalled $59,500.57.

[11]For the reasons set forth at the beginning of the Discussion section of
the instant opinion, the Trustee cannot successfully pursue any of the Retirement
Account Contributions, which contributions the Trustee values at $86,000, as
fraudulent transfers via the Arbogast Fraudulent Transfer Action.  Recovery of
the Retirement Account Contributions, however, can be pursued via the
exemption objection that has been lodged by both the Trustee and Trizec.

a spouse constitutes a necessity, and so rules that the Debtor received

reasonably equivalent value in return for any of the direct deposits of his salary

that may have been utilized to fund such purchase.  Because the Court so rules,

the Court need not make a determination as to whether all, or any portion, of the

$75,842.42 in insurance premium payments were actually funded with the direct

deposits of the Debtor's salary that were made into the Entireties Checking

Account.

      **(e)**     **Summary of the Reasonably Equivalent Value analysis.**

For all of the foregoing reasons, the total extent to which the Debtor failed

to receive reasonably equivalent value in return for the direct deposits of his

salary into the Entireties Checking Account equals $143,389.10 (i.e., $71,872.32

+ $71,516.78).[12]

      **(ii)**     **Whether the Debtor was insolvent?**

The $143,389.10 worth of direct deposits of the Debtor's wages for which

he did not receive reasonably equivalent value in return do not automatically

constitute constructive fraudulent transfers under § 5104(a)(2)(ii) and/or § 5105.

Such direct deposits constitute constructive fraudulent transfers under

§ 5104(a)(2)(ii) only if, while they were being made, the Debtor "intended to incur,

or believed or reasonably should have believed that ... [he] would incur, debts

---

[12]The Court determines that, if the lookback period for the Arbogast
Fraudulent Transfer Action would have been from January 15, 2006, until
January 15, 2010, then the total extent to which the Debtor would have failed to
receive reasonably equivalent value in return for the direct deposits of his salary
into the Entireties Checking Account would have equalled $183,316.61 (i.e.,
$123,816.04 + $59,500.57).

beyond ... [his] ability to pay as they became due." 12 Pa.C.S.A. § 5104(a)(2)(ii).

Such direct deposits constitute constructive fraudulent transfers under § 5105

only if "the [D]ebtor was insolvent at th[e] time [of the direct deposits in question]

or the [D]ebtor became insolvent as a result of [such direct deposits]." 12

Pa.C.S.A. § 5105.

"A debtor is insolvent if, at fair valuations, the sum of the debtor's debts is

greater than all of the debtor's assets." 12 Pa.C.S.A. § 5102(a) (Purdon's 2012).

"Assets under this section do not include property ... that has been transferred in

a manner making the transfer fraudulent under this chapter." 12 Pa.C.S.A.

§ 5102(d) (Purdon's 2012). Therefore, "exclud[ed] from the computation of the

value of the debtor's assets [is] any value that can be realized only by avoiding a

transfer of an interest formerly held by the debtor." 12 Pa.C.S.A. § 5102,

Committee Cmt. 4 (1993). Also excluded from the computation of the value of a

debtor's assets are exempt property and property held as tenants by the entirety

to the extent that such tenancy cannot be severed by a creditor of only one

tenant. 12 Pa.C.S.A. § 5102, Committee Cmt. 1 (1993).

The Court finds that, as was the case for the Debtor when he filed for

bankruptcy, he practically did not possess any assets for purposes of § 5102(a)

during any portion of the lookback period for the Arbogast Fraudulent Transfer

Action (i.e., between 4/23/03 and 4/23/07). The Court finds as it does because

all of the Debtor's assets during such period were either entireties assets or

exempt retirement assets. Relevant to such finding, the Court holds that the

value of the direct deposits of the Debtor's wages into the Entireties Checking

Account cannot be counted as an asset for purposes of insolvency testing under

§ 5102(a).  The Court so holds because such direct deposits were instantly

transferred into such bank account, which bank account, because it is an

entireties asset, cannot itself be considered when assessing the value of the

Debtor's assets for purposes of § 5102(a).  Some portion of the direct deposits

also cannot be counted as an asset for purposes of § 5102(a) by virtue of the

application of § 5102(d) to the instant matter.

The Debtor and Mrs. Arbogast contend that the fact that the Debtor had

no assets during the applicable lookback period should not be fatal to their

defense.  They so argue because they contend that, during such lookback

period, the Debtor also essentially had no debt.  The Debtor and Mrs. Arbogast

argue that the Debtor had no debt during the applicable lookback period

because, they maintain, the Debtor's liability for Trizec's claim (i.e., the claim that

has now been reduced to the Lease Litigation judgment) cannot be counted as

debt during such period for purposes of § 5102(a).

The Court understands the Debtor and Mrs. Arbogast to advance several

reasons for their position that the Debtor's liability for Trizec's claim cannot be so

counted, namely (a) that Trizec's claim was not reduced to judgment until June 7,

2006, (b) that such claim was consequently not liquidated until more than three

years of the applicable lookback period had already passed, and (c) that such

claim of Trizec was still subject to genuine dispute by virtue of appeals that did

not conclude until 2009, or well after the end of the applicable lookback period.

The Court rejects such arguments for several reasons, and thus disagrees that

60

the Debtor's liability for Trizec's claim cannot be counted for purposes of insolvency testing under § 5102(a).

First, several of the definitions in § 5101(b) dictate that the Debtor's liability for Trizec's claim be so counted.  In particular, "debt" is defined as "[l]iability on a claim."  12 Pa.C.S.A. § 5101(b).  "Claim" is defined as "[a] right to payment, *whether or not the right is reduced to judgment, liquidated, unliquidated*, fixed, contingent, matured, unmatured, *disputed, undisputed*, legal, equitable, secured or unsecured."  Id. (emphasis added).  Given the foregoing definitions, it matters not, when determining whether a debt counts for purposes of insolvency testing under § 5102(a), that such debt (a) has not yet been reduced to judgment, (b) is still unliquidated, or (c) is subject to a genuine dispute.

Second, and perhaps more importantly, the foregoing holding and definitional analysis by the Court is supported by case authority that, because it construes very similar, if not relevantly identical, definitional language in the earlier, since replaced, Uniform Fraudulent Conveyance Act, still arguably constitutes binding case precedent with respect to the instant matter.  *See* United States v. Green, 201 F.3d 251, 257 (3rd Cir. 2000) (citing Baker v. Geist, 321 A.2d 634, 636-37 (Pa. 1974)); Norfolk & Western Railroad Co. v. Wasserstrom, 1991 WL 183385 at 2 (E.D.Pa. 1991); Keeney v. Stremmel, 1991 WL 341742 at 1 (Pa.Com.Pl. 1991).  Such case authority stands for the proposition, in particular, that, for purposes of determining a debtor's insolvency status within the context of a constructive fraudulent conveyance action, a disputed,

61

unliquidated claim that has yet to be reduced to judgment nevertheless must be

counted as debt, and it must be counted as debt for a period even prior to the

filing of a lawsuit against such debtor.  *See* Green, 201 F.3d at 257 (citing Geist

for the proposition that "the Pennsylvania Supreme Court has found that

awareness of a probable legal action against a debtor amounts to a debt for

purposes of determining solvency"); Geist, 321 A.2d at 635-37 (appellee's debt to

appellant existed, thereby making appellee insolvent, prior to October 24, 1969,

which date preceded (a) the filing of the tort action against appellee, (b) the

verdict that resulted in judgment against appellee, and (c) the conveyance

engaged in by appellee that was ultimately determined to be fraudulent);

Wasserstrom, 1991 WL 183385 at 2 (same); Keeney, 1991 WL 341742 at 1

(same); Kit Weitnauer, Anatomy of a Fraudulent Transfer Case: Hidden

Complications, 2008 Ann. Surv. of Bankr. Law Part I § 10 (Norton 2008) ("the

determination of the amount of the disputed claim 'relates back' to the time of the

asset transfer for the purposes of determining insolvency").

Third, no case authority exists for the proposition that, just because "[a]

presumption of insolvency [under § 5102(b)] does not arise from nonpayment of

a debt as to which there is a genuine bona fide dispute," 12 Pa.C.S.A. § 5102,

Committee Cmt. 2 (1993), a disputed debt must also not be counted when

conducting the balance sheet test for insolvency under § 5102(a).

Therefore, this Court holds:

(a)     that Trizec's claim against the Debtor counts as indebtedness of the

        Debtor, for purposes of determining the Debtor's insolvency under

§ 5102(a), going all the way back to at least July 2000, which is when

Trizec brought its action in the Common Pleas Court against, *inter alia*, the

Debtor;

(b)    that the liquidation of such claim of Trizec, which claim has now been

reduced to the Lease Litigation judgment, relates back to at least the

beginning of the applicable lookback period on April 23, 2003, for

purposes of determining the Debtor's insolvency under § 5102(a); and

(c)    that, by virtue of the existence of such indebtedness throughout the

applicable lookback period, the Debtor was insolvent for purposes of

§ 5102(a) throughout such lookback period.

Finally, this Court's determination that the Debtor was insolvent for

purposes of § 5102(a) throughout the applicable lookback period is not affected

by the fact that the incurrence by the Debtor of his indebtedness to Trizec may

have perhaps created in the Debtor's favor a corresponding asset in the form of a

right against all of the other former T & M partners for contribution.  The Court so

holds because, even accepting *arguendo* that Trizec's claim may have created

such a contribution right in the Debtor's favor, an argument that the existence of

such contribution right should operate, for purposes of an insolvency

determination, to completely counterbalance the weight of Trizec's claim is

flawed, and such flaw should be readily apparent.  The flaw in such an argument

is that the value of such contribution right in the Debtor's favor could be worth as

much as the entire amount of the Debtor's joint and several liability on the

indebtedness that he owes to Trizec.  Indeed, if such contribution right were

63

worth as much as the amount of such indebtedness owed to Trizec, then the

Debtor would ultimately not be liable for even a very small percentage of such

debt as between himself and his former T & M partners, which is certainly not the

case.

Therefore, the Debtor was insolvent throughout the entirety of the

applicable lookback period (i.e., from 4/23/03 to 4/23/07).

### (iii)     Resolution of actions under §§ 5104(a)(2)(ii) and 5105.

As a consequence of all of the foregoing analysis, the Trustee has proven

her case under § 5105, and is thus entitled to a judgment in her favor regarding

her action brought thereunder in the amount of $143,389.10.  Briefly, the Trustee

has preponderantly proven that (a) Trizec's claim arose well before all of the

direct deposits that were made between April 23, 2003, and April 23, 2007, (b)

the Debtor did not receive reasonably equivalent value in return for such direct

deposits to the extent of $143,389.10, and (c) the Debtor was insolvent at all

times between April 23, 2003, and April 23, 2007.

The Court concludes that the Trustee is not potentially entitled to a

judgment under § 5104(a)(2)(ii) for an amount in excess of $143,389.10.

Therefore, and because she is entitled to a judgment for such amount via her

action under § 5105, it really matters not whether the Trustee (a) has also

preponderantly proven that the Debtor, while such direct deposits were being

made, intended to incur, or believed or reasonably should have believed that he

would incur, debts beyond his ability to pay as they became due, and (b) could

thus also prevail under § 5104(a)(2)(ii).  The Court holds summarily, however,

64

that, in light of all of the foregoing analysis, the Trustee could prevail under § 5104(a)(2)(ii) as well in the amount of $143,389.10.

Pursuant to § 550(a)(1), the Court will impose the foregoing judgment for $143,389.10 upon, that is against, the Debtor and Mrs. Arbogast jointly and severally.

**II.**   **Objection to exemption of the Retirement Account Contributions.**

As set forth earlier herein, the Trustee cannot successfully pursue any of the Retirement Account Contributions as fraudulent transfers via the Arbogast Fraudulent Transfer Action.  However, the Trustee and Trizec are free to pursue a recovery of the Retirement Account Contributions via the exemption objection that they have filed respecting such contributions.

The Retirement Account Contributions, which were made during 2003 and 2004, are valued by the Trustee at $86,000.  The Schnader Law Firm directly deposited all of such $86,000 into two separate retirement accounts of the Debtor.  The Schnader Law Firm deposited $30,000 of such contributions into the Debtor's 401(k) account upon direction of the Debtor.  The Schnader Law Firm deposited the other $56,000 on the Debtor's behalf into what the Debtor testified was a mandatory retirement account (hereafter "the Mandatory Retirement Account").  The Court finds that the Debtor had no control over the $56,000 worth of deposits that were made into the Mandatory Retirement Account, and that he did not have the option of being paid such $56,000 currently rather than having the same be deposited into such retirement account.

As also set forth earlier herein, the Trustee and Trizec now object to the

Debtor's exemption of additional contributions that the Debtor at trial admitted were made into both his 401(k) account and the Mandatory Retirement Account (hereafter "the Retirement Accounts") between 2005 and 2010.  The Trustee and Trizec contend that they may so object to the Debtor's exemption of such additional contributions even though they failed to apprise the Debtor of their intention to so object prior to trial.  The additional contributions that were made into the Mandatory Retirement Account between 2005 and 2010 total $78,741.  $18,000 of additional contributions were made into the Debtor's 401(k) account in 2005, with another $6,353 of additional contributions being deposited into such account between 2006 and 2010.  Such additional contributions, along with the Retirement Account Contributions that were made in 2003 and 2004, shall henceforth be collectively referred to herein as "the Retirement Account Contributions."

In his Bankruptcy Schedule C the Debtor has elected to claim the exemptions afforded to him under 11 U.S.C. § 522(b)(3), that is those exemptions provided by federal nonbankruptcy, state and local law, as well as the exemption generally of property held as a tenant by the entirety.  Thus, the Debtor has elected not to take those exemptions afforded to him under 11 U.S.C. § 522(b)(2), that is the federal exemptions provided under 11 U.S.C. § 522(d). Paragraph (C) of § 522(b)(3) allows a debtor to exempt, in full, "retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986."  11 U.S.C.A. § 522(b)(3)(C) (West 2012).  An

66

examination of the Debtor's Schedule C reveals that the Debtor has exempted

the entire balances in the Retirement Accounts, in particular, pursuant to

§ 522(b)(3)(C).  Such exemption, the Court concludes, is entirely appropriate.

The Trustee and Trizec, however, object to the Debtor's exemption of the

Retirement Account Contributions that have been made into the Retirement

Accounts despite the Debtor's exemption of such accounts in their entirety

pursuant to § 522(b)(3)(C).  The Court understands the basis for such objection

by the Trustee and Trizec to be that (a) the Retirement Account Contributions

themselves constitute fraudulent transfers, and (b) the Retirement Accounts

cannot, as a matter of law, be exempted pursuant to 42 Pa.C.S.A.

§ 8124(b)(1)(ix) to the extent that contributions that have been made into such

accounts themselves constitute fraudulent transfers.

42 Pa.C.S.A. § 8124(b)(1)(ix)(C) does indeed provide, as the Trustee and

Trizec contend, that retirement accounts generally cannot be exempted pursuant

to § 8124(b)(1)(ix) to the extent that contributions made into such accounts are

determined to be fraudulent conveyances.  However, fatal to the position of the

Trustee and Trizec is the presumption that they have made, for whatever reason,

that the Debtor seeks to exempt the Retirement Accounts pursuant to

§ 8124(b)(1)(ix).  As set forth above, the Debtor exempts such accounts pursuant

to § 522(b)(3)(C), which statutory exemption provision does not contain any

limitation such as the one for "fraudulent conveyances" that is found at

§ 8124(b)(1)(ix)(C).

The Court notes that § 522(b)(3)(C) is a relatively new provision within the

Bankruptcy Code, only having been added by amendment thereto to be effective for cases that are commenced on or after October 17, 2005.  However, such statutory provision clearly applies to the instant bankruptcy case given that it was commenced on January 15, 2010.

Also serving to confuse the instant matter to the point where perhaps the Trustee and Trizec lost sight of the Debtor's statutory basis for his exemption of the Retirement Accounts is the fact that counsel for the Debtor appeared to proceed before, during, and after the instant litigation as if the Debtor were utilizing § 8124(b)(1)(ix) rather than § 522(b)(3)(C) to exempt such retirement accounts.  Fortunately for the Debtor, that his counsel has so proceeded throughout the instant litigation does not operate to somehow override the fact that he has formally exempted the Retirement Accounts in his Schedule C pursuant to § 522(b)(3)(C).

Therefore, it matters not, when resolving the instant exemption objection of the Trustee and Trizec, that some of the Retirement Account Contributions themselves may constitute fraudulent transfers.  The Court repeats that the Debtor's exemption, pursuant to § 522(b)(3)(C), of the Retirement Accounts, including the Retirement Account Contributions that were made into such accounts, is entirely appropriate.  Consequently, the objection of the Trustee and Trizec to the Debtor's exemption of such retirement accounts and contributions is overruled.

Finally, the Court wishes to note briefly that, even if the Debtor could only have exempted the Retirement Accounts pursuant to § 8124(b)(1)(ix) (i.e, by way

of § 522(b)(3)(A)), very little, if any, of the instant exemption objection of the

Trustee and Trizec could have been sustained.  The Court so rules for several

reasons.  First, none of the Retirement Account Contributions that were made

into the Mandatory Retirement Account constitute fraudulent transfers.  That is

because none of such contributions constitute transfers, even indirectly, that

were made by the Debtor in the first instance.  None of such contributions

constitute indirect transfers by the Debtor because he lacked control over such

contributions, that is he did not have the power to choose between deferring such

compensation or instead receiving the same as a present paycheck.  Second,

the lookback period that would apply when determining whether any of the

Retirement Account Contributions constitute fraudulent transfers (that would then

be subject to the exemption limitation found at § 8124(b)(1)(ix)(C)[13]) would be

from January 15, 2006, to January 15, 2010, rather than the 4/23/03 – 4/23/07

lookback period that applied with respect to the Arbogast Fraudulent Transfer

Action.  The Court so rules (a) because, as set forth earlier herein, the Arbogast

Fraudulent Transfer Action only implicated the direct deposits of the Debtor's

wages into the Entireties Checking Account, that is such action failed to also

implicate direct deposits that were made into the Retirement Accounts, and (b)

because, absent the existence of some other relevant fraudulent transfer lawsuit

---

[13]When ascertaining whether retirement account contributions constitute
fraudulent conveyances so as to limit, pursuant to § 8124(b)(1)(ix)(C), the
exemption that a debtor can take in a retirement account under § 8124(b)(1)(ix),
the 4-year statute of limitations or lookback period mandated under § 5109 of
Pennsylvania's version of the Uniform Fraudulent Transfer Act must be applied.
*See* In re Allen, 228 B.R. 132, 136 & n.8 (Bankr.W.D.Pa. 1998).

that the Trustee and Trizec could leverage off of for which a different lookback period applies, the applicable 4-year lookback period would date back from when the Debtor would have first sought to utilize § 8124(b)(1)(ix), which date in this case would be when the Debtor filed for bankruptcy, *see* Allen, 228 B.R. at 136. Using a lookback period from January 15, 2006, to January 15, 2010, would operate to shield from classification as fraudulent transfers those Retirement Account Contributions that were made between 2003 and 2005.  Left for consideration then would only be those Retirement Account Contributions that were made into the Debtor's 401(k) account between 2006 and 2010, which contributions total $6,353.  Such contributions equalling $6,353 would represent the sum and substance of that which the Trustee and Trizec could have recovered via their instant exemption objection (a) had the Debtor chosen to exempt the Retirement Accounts pursuant to § 8124(b)(1)(ix) rather than under § 522(b)(3)(C), and (b) presuming that the Court would overlook the failure of the Trustee and Trizec to place the Debtor on notice prior to trial that they intended to object to his exemption of Retirement Account Contributions that were made between 2005 and 2010.

**III.**   **The sanctions motion brought by the Debtor and Mrs. Arbogast.**

The Court wishes to say very little regarding the motion for sanctions that the Debtor and Mrs. Arbogast brought prior to the first trial in the instant adversary proceeding.  Such sanctions motion was brought to address the apparent failure by the Trustee and Trizec to comply with a consent case management Order of Court that was entered on April 21, 2010.

70

With respect to such motion, the Court understands that the Debtor and

Mrs. Arbogast experienced much frustration in preparing for their defense at trial

as a result of the failure by the Trustee and Trizec to provide greater detail

regarding those transfers that they alleged were fraudulent in nature.  However,

the Court also understands that the Trustee and Trizec provided the information

that they did, at least in part, as a means to preserve their position, in case of a

possible appeal, that the applicable law that was to be used to resolve the instant

matter had been misstated by the predecessor judges (i.e., the Common Pleas

Court and Judge McCullough).

Because this Court agrees with the Trustee and Trizec that a certain

portion of the applicable law that must be used to resolve the instant matter was

indeed misstated by such predecessor judges, and since the confusion that

ensued as a result of such misstatement has not been cleared up until now by

the rendering of the instant opinion, the Court cannot see fit to monetarily

sanction the Trustee and Trizec.  Therefore, the Court will deny such sanctions

motion.

**IV.    The impact of *Stern v. Marshall* on the instant matter.**

Because of the recent decision by the United States Supreme Court in

Stern v. Marshall, 131 S.Ct. 2594, 180 L.Ed.2d 475 (U.S. 2011), an issue arises

as to whether this Court has the constitutional authority to enter a final decision in

a fraudulent transfer action that is brought pursuant to state law by way of

§ 544(b)(1).  *See* In re El-Atari, 2011 WL 5828013 at 3 n.4 & 4 (E.D.Va. 2011);

Jonathan P. Friedland, *Stern v. Marshall* – The Supreme Court Revisits

71

_Marathon_, Commercial Bankruptcy Litigation § 3:4 (2012).  In fact, this very issue has been raised by certain similarly situated parties in other adversary proceedings that are presently pending before this Court.  As the Court understands it, these litigants argue only that this Court lacks the constitutional authority to enter a final decision in a fraudulent transfer action brought under state law via § 544(b)(1), not that this Court lacks subject matter jurisdiction altogether regarding such an action.

This Court is inclined to agree with those authorities that construe the Stern decision narrowly and hold that, notwithstanding Stern, a bankruptcy court possesses the constitutional authority to enter a final decision regarding a fraudulent transfer action that is brought pursuant to state law by way of § 544(b)(1).  _See_ El-Atari, 2011 WL 5828013 at 3 n.4 (citing cases).  Therefore, this Court concludes that it possesses the constitutional authority to enter a final judgment in the Arbogast Fraudulent Transfer Action.  Also supporting the preceding conclusion by the Court is the fact that the Debtor removed the Arbogast Fraudulent Transfer Action to this Court; because of such removal, the Debtor arguably consented to have this Court enter a final judgment in the Arbogast Fraudulent Transfer Action.

However, the Court also holds that, even if it does not possess such authority, it at least possesses subject matter jurisdiction over such a fraudulent transfer action and, thus, also the constitutional authority to submit proposed findings of fact and conclusions of law to a district court regarding said action. _See_ In re Canopy Financial, Inc., 2011 WL 3911082 at 4-5 (N.D.Ill. 2011); El-

72

Atari, 2011 WL 5828013 at 3-4.  Therefore, the Court concludes that, because it possesses subject matter jurisdiction over the Arbogast Fraudulent Transfer Action, it thereby is also vested with the constitutional authority to at least propose findings of fact and conclusions of law to a district court regarding such action.

In light of the foregoing, the Court takes the view that the instant Memorandum Opinion (and accompanying Order of Court) constitutes a final judgment to the extent that it pertains to the Arbogast Fraudulent Transfer Action. However, if a U.S. District Court ultimately disagrees with this Court and determines that, pursuant to Stern v. Marshall, this Court may not enter a final judgment in such action, then the portions of this Court's opinion and order that pertain to such action constitute proposed findings of fact and conclusions of law.

## CONCLUSION

For all of the foregoing reasons, the Court will grant judgment in favor of the Trustee, and against the Debtor and Mrs. Arbogast jointly and severally, on the Arbogast Fraudulent Transfer Action in the amount of $143,389.10.  The Court will also overrule the objection of the Trustee and Trizec to the Debtor's exemption of the Retirement Accounts, including the Retirement Account Contributions that were made into such accounts.  Finally, the Court will deny the

sanctions motion that has been brought by the Debtor and Mrs. Arbogast.

**BY THE COURT**


**/S/** _____
**BERNARD MARKOVITZ,**
**U.S. Bankruptcy Judge**

**DATED:        February 7, 2012**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE:** | : | |
| | : | |
| **THOMAS DARE ARBOGAST,** | : | **Bankruptcy No. 10-20237-TPA** |
| | : | |
| Debtor. | : | **Chapter 7** |

..................................................................:.................................................................

| | | |
|---|---|---|
| **Natalie Lutz Cardiello, Trustee,** | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Adversary No. 10-2092-BM** |
| | : | |
| **Thomas D. Arbogast &** | : | |
| **Mary Claire Arbogast,** | : | |
| Defendants. | : | |

..................................................................:.................................................................

| | | |
|---|---|---|
| **Trizechahn Gateway, LLC &** | : | |
| **Natalie Lutz Cardiello, Trustee,** | : | |
| Movants, | : | |
| | : | |
| v. | : | **Related to Doc. No. 20** |
| | : | |
| **Thomas Dare Arbogast,** | : | |
| Respondent. | : | |

**<u>ORDER OF COURT</u>**

　　　**AND NOW,** this **7th day** of **February, 2012**, for the reasons, and utilizing

the nomenclature, set forth in the accompanying Memorandum Opinion of the

same date; it is **hereby ORDERED, ADJUDGED, AND DECREED** that:

(a)　　judgment is **GRANTED in favor of the Trustee, and against the Debtor**

　　　　**and Mrs. Arbogast jointly and severally**, in the Arbogast Fraudulent

　　　　Transfer Action in the amount of $143,389.10;[1]

_____

　　　　[1]If it is ultimately determined that, pursuant to <u>Stern v. Marshall</u>, this Court
may not enter a final judgment in the Arbogast Fraudulent Transfer Action, then
this Court's granting herein of a judgment in favor of the Trustee, and against the

(b)      the objection of the Trustee and Trizec to the Debtor's exemption of the

Retirement Accounts, including the Retirement Account Contributions that

were made into such accounts, is **OVERRULED**; and

(c)      the motion for sanctions that has been brought by the Debtor and Mrs.

Arbogast is **DENIED**.

**BY THE COURT**

**_/S/_**_____
**BERNARD MARKOVITZ,**
**U.S. Bankruptcy Judge**

cm:      John P. Vetica, Jr., Esq.
         Neal H. Levin, Esq.
         Nicholas D. Krawec, Esq.
         Joseph F. McDonough, Esq.
         Natalie Lutz Cardiello, Esq., Ch. 7 Trustee
         Office of the United States Trustee
         (to be served electronically by case administrator)

---

Debtor and Mrs. Arbogast, shall constitute this Court's recommendation (i.e.,
proposed findings of fact and conclusions of law) regarding such action to the
U.S. District Court.